M. J. CROWELL v. THE STATE.

No. 4023.    Decided May 26, 1909.

Rehearing Granted June 19, 1909.

**1.—Murder—Evidence—Silence of Defendant—Declarations of Third Party.**

Upon trial for murder it was reversible error to admit in evidence the defendant's silence touching declarations made in his presence by a third party, to the effect that a horrible murder had been committed. Following Hanna v. State, 46 Texas Crim. Rep., 5, and other cases.

**2.—Same—Evidence—Declarations of Third Party.**

Upon trial for murder it was reversible error to admit in evidence the defendant's silence upon the declarations of a witness to the effect if defendant was aware of the fact that the people thought his wife was murdered.

**3.—Same—Evidence—Expert Opinion.**

Upon trial for murder there was no error to permit the State's witness to state, after showing that he was familiar with the existing conditions, whether it would have been possible for the body of a person weighing 135 pounds to have rolled against the stairway door without knocking it open.

**4.—Same—Evidence—Shorthand Rendering of Facts.**

Upon trial for murder there was no error to admit testimony that when defendant came into the house where his dead wife lay, that there were no manifestations of sorrow or grief on his part.

**5.—Same—Evidence—Declarations by Defendant.**

Upon trial for murder there was no error in admitting the declarations of the defendant, in conversation with a third party about the nonattendance of his children at school, that he did not have time to attend to this school work, etc., and as for his place there had to be a decided change take place; this implied a dissatisfaction with defendant's home life, etc., and implied ill-will towards his wife whom he was alleged to have murdered; although such statement was very general it could not have injured appellant.

**6.—Same—Evidence—Intoxication.**

Upon trial for murder there was no error in admitting in evidence testimony that the defendant was under the influence of whisky on the morning of the day of the homicide, and that his eyes and face showed it.

**7.—Same—Evidence—Argument of Counsel.**

Upon trial for murder there was no error in State's counsels argument concerning the failure of defendant's brother to testify to his disclosures of the condition of the stairway before the grand jury.

**8.—Same—Charge of Court—Murder in the Second Degree.**

Upon trial for murder where the evidence showed that defendant was at home on the day of the death of his wife; that he spoke to her and she to him; and in face of all the facts and circumstances, the court did not err in charging on murder in the second degree.

**9.—Same—Charge of Court—Alibi—Charge on Weight of Evidence.**

Where upon trial for murder the defendant pleaded alibi, and the court charged among other things that if defendant was at said time at another and different place from that at which said offense had been committed they should find him not guilty, the same was not on the weight of the testimony when considered with other parts of the charge where the court instructed the jury "if an offense was committed," etc.

**10.—Same—Charge of Court.**

Upon trial for murder the charge of the court directing an acquittal of defendant, in the event that the deceased was not dead, could not have injured the defendant in any way; the death of the deceased being unquestionable.

**11.—Same—Misconduct of Jury—Comparisons.**

Upon trial for murder there was no error that the jury while discussing and deliberating upon their verdict went out and looked at the stairway of the courthouse; there being evidence in the case that the deceased was killed accidentally by a fall from the stairway in her home.

**12.—Same—Sufficiency of the Evidence.**

Where upon trial for murder the evidence against the accused was not so inconclusive as would justify the court to set aside the conviction, the same was sustained.

Appeal from the District Court of Clay. Tried below before the Hon. A. H. Carrigan.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Hoover & Taylor* and *Allen, Jones & Allen,* for appellant.—On question of defendant's silence and opinion of witness: Loggins v. State, 8 Texas Crim. App., 434; Felder v. State, 23 Texas Crim. App., 477; Ex parte Kennedy, 42 Texas Crim. Rep., 148, 57 S. W. Rep., 648; McCracken v. State, 6 Texas Crim. App., 507; Campbell v. State, 30 Texas Crim. App., 645; Maines v. State, 23 Texas Crim. App., 568; Nalley v. State, 28 Texas Crim. App., 387. On question of misconduct of jury: Ysaguirre v. State, 42 Texas Crim. Rep., 253, 58 S. W. Rep., 1005; Austin v. State, 42 Texas, 355; Cox v. State, 28 Texas Crim. App., 92; Mitchell v. State, 36 Texas Crim. App., 288; McKissick v. State, 9 S. W. Rep., 269.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant appeals from a conviction of murder in the second degree had in the District Court of Clay County, on December 3, 1908, in which he received sentence of fifteen years imprisonment in the penitentiary.

The record is very voluminous, and the testimony for the most part is circumstantial. The evidence in brief showed that appellant and his wife, Emma Crowell, resided on a farm in Clay County, some six or seven miles from Wichita Falls, and that there was living with them at the time of the death a Miss Lula Smith, who was teaching school near by, their little girl, Thelma Crowell, about eight years of age, and Willie Crowell, a son about sixteen years old. The testimony tended to show that Miss Smith and the children left for school on the morning of November 2, 1908, and before the son left the appellant had gone to his work in the field. John Fetcher testified that he was at appellant's house on the day of the death between eleven and twelve o'clock, and saw and talked with Mrs. Emma Crowell. It was shown by statements of appellant that he was at home about the noon hour. The testimony also showed that, in the afternoon of the day in question, appellant was in the field at work some little distance from the house, and was so engaged when informed of his wife's death. Her dead body was discovered late in the afternoon when Miss Smith and the little girl, Thelma, returned from school. These two gave the alarm, and among others promptly called was Mrs. Mary Crowell, the wife of appellant's brother, H. V. Crowell. The evidence excluded any question of robbery or other character of assault. It excludes any question that, unless it was appellant, there was any other person entertaining ill-will or enmity towards deceased. The room where she died was undisturbed, and all of her belongings and valuables were about the place, wholly untouched. It was among others the theory of the appellant that the death of his wife was due to an accident.

When discovered she was found on the stairway, and as one of the witnesses says, she was lying on her right side on the stairway, with her limbs turned up same, and with her back to the door. The evidence shows that this door, from the first floor of the residence, was very insecurely fastened, and it opened with almost the slightest pressure. The evidence further disclosed that Mrs. Crowell, the deceased, was a little below the average height, rather stout, and would weigh from 135 to 140 pounds, and that she had a heavy suit of hair, and was of a happy and cheerful disposition. When found, Mrs. Mary Crowell states that the left side of her face was turned up, and her hair was torn up and matted considerably; that deceased always wore her hair twisted on top of her head, but some of her hair was not in the middle twist, but was torn loose, and a great deal of the loose hair was all pulled out and was over her face. Another witness, Joseph Rinefeldt, gave the following description of the wounds on the body of Mrs. Crowell: "The left eye was pretty badly pounded or knocked up," and that there was a little hole knocked through her left ear; and a hole behind her ear; that over one of her hands was quite a blue and black spot across it—a big one—and another smaller one, and another one about her wrist, running across the arm, and there were a few on the other hand; that her lips were all battered up, and puffed and swelled up, and that there was a wound back of the head which was also back of her ear. Dr. Miller, who made the examination the next day, testified that her skull was crushed on the left side, a place about the size of a dollar; that it began about an inch above the left eye, and ran back over the left ear about two inches; that the fractured piece of bone was probably an inch and a half wide and probably two inches long; that there were other bruises about the face and head—several bruises on the head; that the bruises were located all over her face, and the ear cut through, and looked to have been done with a heavy bruise, or likely to have been mashed more than cut. A. J. Tucker, justice of the peace, who also examined the body the next day, and who made a more careful examination the succeeding day, testified that her skull on the left side, near the temple, was crushed, and there was a cut behind the left ear, and she was bruised all along the front part of her forehead, and that there was a lick right on the back of her head which had the appearance of a sort of sunk or dented place; that this was about two inches long. It is also shown that there was a slight bruise on the left knee near the underportion of same. There were no other bruises on her limbs or about her hips or elbows, or other portions of her body, where most likely evidence of injury would have been received from a fall. It was shown also that the staircase was carpeted, and that this staircase was seven feet and one inch from the bottom floor to the top floor. There were no blood stains on the carpet or stairway. There was some evidence of loose planks, and things of that sort, which might have accounted for her injuries as from a fall. As stated above, immediately on discovering the condition of the body, his son, Willie Crow-

ell, was sent to the field for appellant to tell him that they had found the former's mother on the steps dead. That when so informed appellant made no reply, and said nothing at all, but got off of his plow and started to unhitch, and then told his son to go and tell Mrs. Rinefeldt; that this was all that he said to his son, "Go by and tell Mrs. Rinefeldt;" that he asked him no questions in regard to how she was lying or anything of that sort. It was also shown by the testimony that Willie went to see the Rinefeldts, and informed them of the death of his mother, and that both himself and the Rinefeldts got to the house some fifteen minutes before appellant arrived. It should also be stated, in this connection, that the relation between his wife and appellant was shown by all the testimony to have been very strained; that they had not occupied the same room for five years, and all the children and relatives testify that within that time there had been scarcely any conversation between appellant and his wife. He rarely went with her anywhere, and never except on business in which they were both engaged. His own statement was that she had engaged in some financial venture which did not meet with his approval, and that on one occasion, in the spring before her death, he had struck her on the cheek with his hand. Now then, to return to the circumstances of the killing. When appellant, according to the testimony of Mrs. Mary Crowell, came to the house, he came in the room where she was, and put his hands somewhere about her hips, and leaned over and looked at her, and said to Mr. Johnson that it was not necessary for him to go for a physician, and left the room in a little bit, and then returned in a few minutes, when her husband said to appellant, "Mike, the proper thing to do in a time like this is to hold an inquest, isn't it?" when appellant turned to her, as if to look at her, and said, "Did you say you found her at the foot of the stairway here, with rags up and down the steps?" That witness replied, "Yes," and then he said, "It is an evident fact," or something to that effect—"it is plain it was an accident, and it is not necessary to stir the matter any further." In this connection Mrs. Crowell testified that, at this time, she had told him nothing about where the deceased was found, or about there being any rags up and down the steps. She does say that prior to this time she had found some rags up and down the steps, which she noticed when the body was taken out of the stairway; that these rags apparently came from a basket of rags, which she took for carpet rags, sitting at the top of the stairway; that they were put back in the basket; that up to the time of this conversation she had not told anyone—had not mentioned it to anyone—and that there was no one present except the ladies, and they were busy with deceased's body, bathing her face, and that all of this was before appellant had come to the house. In this connection it is important to observe that appellant says, in a statement made before the grand jury, and introduced in evidence without objection, that "Mary Crowell was the first one who told me about these scraps and basket, and my brother and I went up the steps to look around, but we

did not find anything that we know was disturbed." Victor Crowell, appellant's brother, testified on the trial that he had, before appellant came to the house, informed him of the situation of the basket and the rags being scattered up and down the stairsteps, but he was to some extent contradicted by the fact that, when fully examined before the grand jury touching the matter, he made no reference to these disclosures. Taken altogether, in view of the testimony of Mrs. Mary Crowell, and the admission of appellant, the jury were well justified in believing it to be true that, immediately on his return to the house, he had knowledge that these rags were scattered up and down the stairway, and that the basket was at or near the top of the stairway. If he knew this, the jury were well justified in visiting him with a guilty knowledge and participation in much more. There were a number of other circumstances in the case of an incriminating character. Almost immediately on returning to the house appellant declined to send for a doctor, put aside the holding of an inquest, stated that his wife must be buried at five o'clock the next day, though his children were widely scattered, and it was uncertain as to whether some of them could reach home by that time, and his provision for the interment was not of a character and in keeping, perhaps, with her station, and certainly with the respect and consideration which his daughters and other members of the family thought she was entitled. It was also in evidence that in January, 1906, he had taken out a policy of insurance on his wife in a local order, of the value of something like nine hundred or a thousand dollars, and that on the night of the death of his wife he had written up and had witnessed a notice of her death, and had same mailed the next day. This notice was dated, Wichita Falls, November 2, 1908, and stated that she had died on the same day, and contained this postscript: "Please forward the amount of policy to me, and oblige, respectfully yours, M. J. Crowell." To some of the witnesses who testified he stated, in accounting for the death of his wife, that she was troubled with heart disease, and had probably fallen when so affected, and thus caused her death. It is, however, to be noted that, in the application for insurance, prepared under the direction of appellant, it is stated that his wife had no heart trouble. The appellant proved in his own behalf a good reputation as a peaceable, quiet, law-abiding man, and the testimony introduced on his behalf was for the most part confined to this character of testimony. We have in our own minds no doubt of the sufficiency of the evidence to warrant the conviction, nor do we believe that any error was committed on the trial of the case for which the judgment should be reversed. The case seems to have been well and carefully tried, and, as we believe, none of the matters urged as grounds for reversal are meritorious. The record is quite voluminous, and we do not deem it necessary to discuss all the matters urged, but will notice briefly the more important of them.

1. It is urged that the court erred in admitting the following testimony of the witness A. J. Tucker. Tucker, it will be remembered, was

the justice of the peace who held the inquest, and was permitted by the court to testify, and did testify, substantially as follows: "While I was in the house, or about the house, I did not have any conversation with the defendant or ask him any questions. At the time I was making my examination he was about the place, I suppose; he was not right present that I know of when I was in the house there. When I went out in the yard, or out of the house, after making my examination, I saw the defendant out there; that was the first day I was there; I saw him after I went out; I was there on the evening of the third, and then on the morning of the fourth, and I examined the body and the steps both times. It was the first time, or the evening of the third, that I made the statement in question. He was standing with a number of people out in the yard when I went out there; that is, he came up, I think, at the time that I went out there, and Mr. Sawneymaker introduced me to him—the first time I ever saw him to know who he was. In the defendant's hearing I said that there had been a horrible murder committed, and it was the duty of every good citizen to try to ferret out who did it. I could not say just how far the defendant was from me at the time I said this—the crowd was around, and he was not very far. I will say all the way from ten to fifteen feet from me, I reckon. At that time he looked excited somewhat; he never did a thing nor said a word that I heard." In this connection, on cross-examination, conducted by counsel for appellant, the witness also stated: "I made this statement before I held the inquest; I did not accuse the defendant of murdering his wife; I had no idea who did it. If he had got up and said, 'Well, I never murdered her,' I would then have thought it funny for him to deny it when I never had accused him of it." This testimony was objected to because of the fact that the witness was an officer, and the declaration was one over which appellant could have no control whatever, and which he could not prevent; it would create in the minds of the jury the impression that there was a foul murder committed, when the facts in the case may not indicate that there was a foul murder; that from the facts the jury must determine whether or not it was a murder, and the statement was bound to be a conclusion as to whether it was or not a murder; that in the nature of things it was a statement prejudicial to the rights of appellant, and is an opinion; that it is putting before the jury the very thing that the law says is not permissible in any character of case; that the statement made in the presence of appellant did not indicate to him nor insinuate that he was the man guilty of the murder, and he was not, therefore, required to speak, because he was not in the nature of things charged with the crime. In this connection, by reference to the charge of the court, it appears that the following instruction was given to the jury: "The testimony of the witness Tucker, wherein he expressed his opinion that a horrible murder had been committed, and as to what all good citizens would do, can not, and must not, be considered by you to establish that a murder, or a horrible murder, had been

committed, or that the defendant committed the murder charged in the indictment." Being thus limited, and the jury thus instructed, it is not believed that the admission of this testimony, if it should be conceded that it was improperly admitted, could in the nature of things have injured appellant. As stated by counsel, the declaration of Tucker did not imply an accusation against appellant, or any belief in his guilt. In view of appellant's strange inaction, it was, we think, perhaps competent for the State to show that appellant was advised, by persons whose opinions were entitled to weight, that there were circumstances in their opinion indicating the death to have resulted from other causes than an accident, but, as stated, whatever view might be taken of this question, it is perfectly obvious that, in the light of the instruction of the court below, that appellant is without substantial ground of complaint.

2. A somewhat similar question arose over the testimony of the witness J. E. George. Mr. George was sheriff of Clay County, and the day after the death went to the residence of appellant to make some investigations touching the cause of the death of his wife. The record shows that he had a long conversation with appellant, in which appellant illustrated and undertook to show him how deceased might have fallen down the stairway and killed herself, and how, in his opinion, her death did result. In the course of the examination the State propounded to him the following question: "In any conversation that you had with the defendant, did you inform him that it was thought, or that anyone thought, that this was a murder?" to which he replied: "I asked him if he was aware of the fact that the people thought that his wife was murdered." This testimony was objected to because irrelevant, immaterial and hearsay. In this same connection George testified that appellant stated that "he was aware of that fact; I think he said some man or some person had said something to him about it; I won't say whether it was a man or some person; it might have been that he said 'some man,' or he may have said 'some person.'" In approving this bill the court says that his approval is made with reference to all the testimony of said witness, so as to show the connection in which this testimony was offered. It appears, by reference to the statement of facts, that the sheriff, after appellant had undertaken to show him how, in his opinion, his wife's death occurred, made inquiry of him as to whether his wife had any enemies that he knew of, and if he knew of anyone who could have committed the murder, to which appellant replied that she did not have an enemy that he knew of—if he knew of anybody that could have done this—and he says, "She did not have an enemy in the world that I know of;" that he then asked him if he knew of any Mexicans or negroes or tramps that had been in the country around there, and he said, "not a one;" that he then asked him if he ever kept any money about the house, and he said: "No; we never kept any money about the house, unless there was a little change." That he then asked him if there was anything missing

about the house, and he said, "No, not a thing;" and that nothing was missing, and in this connection he asked him if he was aware of the fact that the people thought his wife was murdered, in response to which he made the statement above quoted. It will be observed that this statement does not imply, even remotely, any accusation against appellant. The sheriff was in the house making investigations, and seeking light and information, and the conversation above inquired about took place in connection with an extended conversation touching the probable cause of her death.

3. While the witness Joseph Rinefeldt was on the witness stand, and after describing fully the stairway and doorway into same, he was asked the question as to whether it would have been possible or impossible for the body of a person weighing 135 pounds to have rolled against the stairway door without knocking it open, to which he answered that a body so rolling against it would have opened it. This was objected to, because not the subject of expert testimony, and the witness was not an expert. We think in questions of weight, strength and power of resistance, and matter of that sort, it is clearly competent for one cognizant and familiar with the conditions shown to exist to express an opinion as to whether a given weight pressing against a door would have opened it. This witness had shown himself quite familiar with the door. It would have been quite difficult to have developed the resisting power of same without putting in evidence the statement of the witness in respect to same, or in some such manner as was done, to have developed the facts.

4. Objection was also made to the testimony of the witness J. F. Johnson, to the effect in substance that, when appellant came into the house where his dead wife lay, that there were no manifestations of sorrow or grief on his part. This was objected to on the ground that the testimony of the witness should be confined to a statement of what the manifestations were, and the jury could tell whether they were of grief or of sorrow. This testimony was but a shorthand rendering of the facts, and was clearly admissible.

5. Objection was made to the testimony of Miss Lula Smith to the declaration or statement made by appellant a short time before the death of his wife, which is thus recited by her: "We were discussing school work, and we had been talking about the nonattention—nonattendance of the pupils—and he said, and that they had—the men folks did not have time to attend to the school work, and that they turned it over to the women of the neighborhood, and they had to gossip about it before they could send their children to school, and as for his place there had to be a decided change take place. That was the substance of what he said to me. I did not make any reply to him. We were at the breakfast table, just Mr. Crowell and myself." This was objected to, because immaterial and irrelevant, and because it did not show that appellant had in his mind any such change as might be considered by the jury on any issue in this case, and because it did not prove or tend

to prove any issue in the case. While the statement is very general, we can readily believe that, in view of the entire evidence as to the nature of the relations of appellant and his wife towards each other, and their controversies and disagreements, that this remark was intended to reflect his dissatisfaction with his home life, showed his dissatisfaction with his environments, and implied his unwillingness to submit to conditions as they then existed, and his determination to seek some change in them, and that it also implied, of necessity, a feeling and attitude of unfriendliness and ill-will towards his wife. If it could not be so appropriated it was, of course, irrelevant, but in any event not of a character that could in the nature of things have injured appellant.

6. On the trial, objection was made to the testimony of Willie Crowell, to the effect that his father was under the influence of whisky on the morning of the 2d of November, and that he showed it in his eyes and face; that appellant was up and about in his room between twelve and four o'clock that night; that the witness knew he kept whisky, and that next morning his eyes were badly blood-shotten and his face red. This testimony was objected to because it is a conclusion of the witness, in the nature of things, opinion testimony, and immaterial. We do not think that the testimony is subject to these objections. As long as wine is mockery and strong drink is raging, the undisputable signs testified to by this boy are so certain as not to escape ordinary observation. If he was in this condition, it accounts for, or, at least, is a circumstance to be considered in connection with, the horrible death of his wife.

7. The other questions, in respect to the testimony of H. V. Crowell, and an examination by the State concerning his failure to testify to his disclosure of the condition of the stairway to his brother before the grand jury, and the argument of the district attorney, have been considered, and we think there was no error in respect to them, and that they do not require further attention.

8. The charge of the court is not to any extent complained of, and is, indeed, an unusually clear and excellent presentation of the issues arising in the case. Appellant does complain, however, that the court erred in charging the jury on murder in the second degree at all, for the reason, as claimed by him, that the only purpose or effect of such charge would be to permit the jury to compromise on a verdict of murder in the second degree in the event they doubted the guilt of the defendant, and the verdict of the jury shows that this charge did have such effect. It has been often held that it is in rare cases that the court should not charge the law of murder in the second degree. In this case, in the light of the testimony of appellant, that he was at home on the day of the death of his wife, and that he barely spoke to his wife, or she to him, and all the facts and circumstances surrounding the death, the court would have been utterly without excuse, and it would have been clearly reversible error not to have charged the law of murder in the second degree.

9. Again, complaint is made that the court erred in that part of his charge wherein he submits the question of alibi in favor of appellant, because, as stated in the motion, in the charge he assumes that an offense has been committed by the use of the following language: "If the defendant was at said time at another and different place from that at which said offense had been committed, they should find him not guilty." Such a charge, it is urged, clearly assumes that the deceased was not accidentally killed. The complaint takes no proper account of the entire paragraph of the court's charge upon this subject. When analyzed and considered as a whole, it seems entirely unobjectionable. It is as follows: "In this case the defendant has interposed the defense of what, in legal phraseology, is termed an alibi; that is, that if an offense was committed at the time and place alleged, that the defendant was at said time at another and different place from that at which said offense was committed, and therefore was not, and could not, have been the person who committed said offense. Now, if you have a reasonable doubt as to the presence of the defendant at the place and at the time where said offense is alleged to have been committed, you will return a verdict of not guilty." An inspection of the charge, we think, makes it demonstrable that it is not subject to the criticism leveled against it by appellant.

10. Again, complaint is made of the following portion of the court's charge: "If you do not find that the said Mrs. Emma Crowell is dead, and that the defendant unlawfully killed her, then you will return a verdict of not guilty." This is criticised because there was no question but that the said Mrs. Crowell was dead, and the charge expressed a doubt in the mind of the court to the jury as to the fact of her death. This paragraph of the charge is not aptly framed, but, as stated, the death of Mrs. Crowell was so unquestionably shown, and since, if she was not dead, no conviction could have been had, it is inconceivable how appellant could have suffered any injury from such an instruction.

11. A new trial was sought on the ground of the misconduct of the jury, because, as stated in the motion, while they were pursuing their deliberations and discussions in respect to their verdict on the third floor of the courthouse, from whence a stairway led from the second floor of the courthouse, and while discussing and deliberating upon their verdict they took and considered said stairway as evidence in the case to aid them in arriving at their verdict. Testimony on this question was taken before the court, and a number of the jurors were sworn and testified. Among others, W. T. Wilson stated that, while they were deliberating, some of the jurors went out and looked at the stairway in the courthouse, leading from the second to the third floor, and that some of the jurors discussed the difference of construction, and height, and other matters between the two stairways. He states, however, on cross-examination, that he did not consider this stairway in evidence in any respect, and it had no effect on him whatever in making up his verdict; that the stairway was just looked at as a kind of

illustration of the stairway in the Crowell home. This was the substance and purport of all the testimony. Every one of the jurors were interrogated. Wilson, Carstetter, Lovell, Threldeld, testified positively that neither the view nor the discussion of the stairway in the courthouse had the slightest effect on their verdict, and all of them in substance say that, in observing same, the differences between the two stairways was pointed out. It is not believed that the observation of this stairway or discussion touching same could have in the slightest degree prejudiced appellant's case.

12. The only other ground of the motion is the insistence that the verdict of the jury is contrary to and unsupported by the evidence, and is not of that degree of certainty demanded by law in criminal trials, and particularly in cases depending on circumstantial evidence. We can not agree to this conclusion. Our own opinion is that the verdict of the jury is well supported by the testimony. In any event it is not so inconclusive as would justify us, in the light of the finding of the jury and the action of the trial court, in refusing to grant a new trial, to set aside the judgment of conviction on this ground.

Finding no error in the judgment, it is in all things affirmed.

*Affirmed.*

BROOKS, JUDGE, absent.

### ON REHEARING.

#### June 19, 1909.

RAMSEY, JUDGE.—On further reflection, we are convinced that this case should be reversed and remanded. The opinion in effect recognized that the testimony of A. J. Tucker, as to statements made by him in the presence of appellant that a horrible murder had been committed, was erroneous. It was believed, however, that the charge of the court in respect to this matter rendered the admission of this testimony immaterial, and probably not hurtful. While the case was ably argued on original submission, there was no brief filed further than a memorandum of the authorities upon which counsel relied, and in the consideration of the case we seemed to have overlooked the fact that there was nothing in the instructions of the court in respect to the silence of appellant in the face of these declarations of Tucker. It is well settled that it is error to admit in evidence a defendant's silence touching declarations made in his presence, unless such statements in effect amount to an accusation against him, and are of a character calling on him to make reply. 2 Wharton on Evidence, sec. 1138; 1 Greenleaf on Evidence, secs. 197, 199, 200 and 233; Loggins v. State, 8 Texas Crim. App., 434; Felder v. State, 23 Texas Crim. App., 477; Ex parte Kennedy, 42 Texas Crim. Rep., 148; 57 S. W. Rep., 648; Skelton v. State, 51 S. W. Rep., 944; Sauls v. State, 30 Texas Crim. Rep., 496; Long v. State, 13 Texas Crim. App., 211; Hanna v. State, 46 Texas Crim. Rep., 5; Gonner v. State, 17 Texas Crim. App., 1; Ex parte

Wilson, 47 S. W. Rep., 996; Baker v. State, 45 Texas Crim. Rep., 392, and Commonwealth v. Harvey, 1 Gray, 487.

We are also of the opinion, upon the same authorities, and based practically on the same reasons, that the testimony of the sheriff, J. E. George, was inadmissible.

The only other matter raised in the motion is the supposed misconduct of the jury, and will probably not arise on another trial, and, therefore, need not be considered.

For the reasons stated the motion for rehearing is granted, the judgment reversed and the cause remanded.

*Reversed and remanded.*