GUERELLIMO HERNANDEZ v. THE STATE.

No. 10867. Delivered May 25, 1927.
Rehearing granted June 6, 1928.

The opinion states the case.

*T. F. Stock,* for appellant.

*A. A. Dawson* of Canton, State's Attorney for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, death.

Mr. Paddock keeps a store in Reeves County. He lived alone and slept in his store. He was seen alive on the 3rd of January 1926. That night his store burned. He has not been seen or heard from since. Amid the smoking ruins of the store were discovered burned parts of a body testified to by physicians as being parts of the body of a man. The heart, part of the shoulder, the ribs, parts of the arms, and some other parts of the body were left. The physicians testified that in their judgment these were human remains and remains of a large man. Paddock was shown to be a large man. He possessed and wore a silver watch of rather unusual appearance. This watch was found where the bones and flesh were found in the ruins of the store. Appellant was arrested, put in jail, and subsequently made a confession in which he said that he went with other

Mexicans to the store of deceased upon an understanding and agreement that the latter should be killed and robbed. This is a sufficient statement of the facts.

Objection was made to the testimony of witness Armstrong as follows: "I remember the incident of the death of Mr. Paddock on January 4, 1926." We regard the objection to this, based on the proposition that the State had not proved that Mr. Paddock was dead, as being hypercritical.

Appellant objected to the introduction of his confession on the ground that no proper predicate had been laid for its introduction in that no sufficient evidence had been introduced to establish the fact of death; also that the confession was not made voluntarily, and was made under duress; also that the alleged confession was made through reliance on promises by the officers that they would protect and assist appellant; also upon the ground that the confession was irrelevant, inadmissible and prejudicial. Further than to set out these objections and to copy the confession, the bill of exceptions is wholly devoid of any showing of facts to support the contentions made. Manifestly such a bill of exceptions brings nothing before this court for review.

Another bill of exceptions sets out rather a lengthy statement of the sheriff which concludes with the statement that in the opinion of the witness appellant was not scared when he gave his confession. We are of opinion that appellant intended to address his objections to this last part of the testimony of the witness. We do not believe the answer of the witness to consist of such an opinion as is deemed objectionable. The officer testified that he had been watching the appellant closely, observed his manner and conduct, and heard him conversing with various people, and that he was not of the opinion that the appellant was scared. Even if the objections had been set out at length, we would not feel inclined to sustain them to this answer.

Complaint is made of the fact that the sheriff put a dictaphone in the cell occupied by appellant in the jail and a witness was permitted to testify that he identified the voice of the defendant by hearing a conversation over the dictaphone. The bill of exceptions does not set out that the witness testified to what the defendant said in such conversation, and we find ourselves unable to appraise the weight of such objection. The witness might have been well able to identify the voice by hearing it in the dictaphone.

Another bill of exceptions complains at the reception of the testimony of witness Massey who said he heard the defendant make a statement about the death of Mr. Paddock down in the sheriff's office at night. This statement of the witness was objected to on the ground that there was a written confession, which was the best evidence. The bill of exceptions does not set out what statement was made by the defendant in the presence of the witness in the sheriff's office, hence we see no support for the objection.

Appellant asked a special charge, in effect, that the remains of Mr. Paddock might be identified by direct or circumstantial evidence, if sufficiently strong; but evidence of facts or circumstances which only tend to prove that Mr. Paddock was dead and which had no relevant bearing toward the identification of the alleged remains as those of W. G. Paddock cannot be used by the jury for the purpose of so identifying said remains. "In other words, the alleged remains cannot be identified, as required by law, by evidence which tends only to show the said W. G. Paddock's death; but the fact of death must be established to your satisfaction beyond a reasonable doubt, by evidence which identifies the alleged remains." This was refused by the court. We have no doubt of the sufficiency of the testimony to establish the death of Mr. Paddock, and that his death resulted from the criminal agency of appellant or appellant and others. The finding of parts of the body of a large man in the burned store of deceased on the night following his last living appearance; the finding of a watch identified by the watch-maker who had been repairing it as that worn by deceased, and others who had seen it in the possession of deceased, same being found in almost immediate contact with the charred remains of the body, coupled with the confession of the defendant, seem to us to present abundant evidence of the corpus delicti. The case on its facts presents strong similarity to the well known case of Kugadt v. State, 38 Texas Crim. Rep. 694. We think the court committed no error in declining to give the special charge.

We have tried to give to the facts in this case and the contentions made on behalf of this unfortunate man, our closest scrutiny, in view of the infliction of the extreme penalty of the law, but finding no error in the record, the judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In appellant's motion for rehearing it is insisted that the evidence is insufficient under the rules of law con-

trolling to support the verdict and judgment. Appellant was convicted for the murder of W. G. Paddock. It is alleged in the indictment that the killing was accomplished "by striking him with a club and by burning him with fire." The disposition of appellant's contention must turn upon the application of the rules of evidence relating to proving the *"corpus delicti"* and the extent to which accused's confession may be available to the state in making such proof, and what other evidence, if any, is demanded before a conviction can be sustained.

The questions are (1) Did Paddock come to his death by the criminal means or agency of someone? and; (2) Was this criminal means or agency the act of appellant or someone acting with him in striking Paddock "with a club or burning him with fire?" Before a conviction for any crime may be had the state must prove first of all that a crime has been committed,—in this case it being that Paddock came to his death by some criminal agency. Where the fact that someone murdered deceased is proven aliunde of the confession the confession of accused may be sufficient to sustain the finding that he is the guilty party. Kugadt v. State, 38 Tex. Cr. R. 694, 44 S. W. 989 and many other cases cited under Section 1890, Branch's Ann. Tex. P. C. Proof of the corpus delicti in a murder prosecution is not sufficient when the death of deceased by criminal violence inflicted by someone is not proven. Lovelady v. State, 14 Tex. Cr. App. 545; Follis v. State, 51 Tex. Cr. R. 186, 101 S. W. 242. It is well understood that the crime itself—in this case the murder of Paddock—can not be proven alone by the confession of accused. The use of the confession and the extent to which it must be corroborated or supported is stated in different opinions and by authors in various ways. In Kugadt's case (supra) the language is:

"In the establishment of the corpus delicti the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence * * * A confession is sufficient, if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce a conviction of the defendant's guilt in the minds of a jury beyond a reasonable doubt. Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of accused. Full proof of the body of the crime, the corpus

delicti, independently of the confession is not required by any of the cases; and in many of them slight corroborating facts were held sufficient."

Many authorities following the principle announced in Kugadt's case will be found collated in Harris v. State, 144 S. W. 232, and in Aven v. State, 95 Tex. Cr. R. 155, 253 S. W. 521. In the latter case the rule is stated in the following language:

"To sustain a conviction for murder the proof must show the death of deceased by violence and that the accused was the guilty agent. This cannot be shown by the confession alone, but the law does not require that it come wholly from evidence independent of the confession."

Perhaps Mr. Underhill in his Third Edition on Evidence, Section 240 states the rule as to the extent of the evidence required in addition to the confession in a somewhat more definite form. He says:

"In the case of all extra-judicial confessions it is the rule that the corpus delicti must be proven by additional evidence before a conviction upon the naked confession alone will be upheld. A conviction may not be had alone upon an uncorroborated confession. * * * The corroborative evidence must, independently of the confession prove or tend to prove that a crime has been committed and that the accused committed it or was connected with it."

The foregoing rule must have been in the court's mind when writing in the case of Ingram v. State, 78 Tex. Cr. 559. In whatever form the principle be stated it is perfectly clear that some proof other than the confession is demanded which shows or tends to show that a crime has been committed by some person. This, of course, may be shown either by direct evidence or circumstantially. Having in mind the rule of law thus controlling we find the evidence in this case (aside from appellant's confession) established the following facts only: Deceased (Paddock) was a man perhaps seventy years of age. He conducted a small store in a two-story box house in a remote section of Reeves County. He had no family but lived alone in the store, occupying the second story as sleeping quarters. No one assisted him in the store. Some time after ten o'clock on the night of January 4th, 1926 the store with its contents was destroyed by fire. There were no near neighbors. It was not discovered that a fire had occurred until the following morning. Officers and neighbors then found among the burning embers scant remains of a human body. So little of it was left that it could not be

identified as that of deceased, but his watch and keys were found near the remains and thus proof of his death was sufficiently established. Only a few bones and other portions of the body were left unconsumed by the fire. It was not attempted to be shown that any wounds on the head or other portions of the body were, or could have been, discovered that might have been inflicted with a club or any other instrument. The almost total destruction of the body would have rendered such an undertaking futile. The remains were found lying near the store safe the door of which was open. It could not be, nor was it attempted to be, shown that the safe had been rifled or anything taken from the store. Deceased's watch at least was not taken. From the facts proven the reasonable inference perhaps would be that deceased came to his death as a result of fire. Was the fire of incendiary origin or an accident? Can we presume that if the fire had not destroyed the body wounds could have been discovered which would indicate the someone had murdered deceased, or can we presume that the fire had been set by someone for the purpose of destroying the life of deceased or concealing some other crime? This question is very clearly answered by this court in Follis v. State, 51 Tex. Cr. R. 186, 101 S. W. 242. In that case the defendant was charged with the murder of one McDonald. Appellant confessed that he killed McDonald by striking him on the head with an axe. Some two weeks after the disappearance of McDonald defendant carried other parties to a raft on the river and pulled up a body which he said was McDonald's. The face was so devoid of flesh that it could not be identified. So the question of identity became an issue in that case, the state resorting to proof of the clothing, etc. After setting out the evidence upon that point and conceding it might be sufficient the opinion continues:

"* * * what evidence have we to corroborate or support the confession as to criminal means or agency used to cause the death of the body? The indictment alleges that the death was caused in various ways; in one count, by being struck on the head with an axe or some blunt instrument, and being stabbed with a knife, and, in another, by being drowned; and, still in another, by some means to the grand jury unknown. Eliminating the last two counts, about which there is no proof, what about the first count? Appellant says by his confession that he killed McDonald by striking him on the head with an axe; that, after he had fallen from the wagon, he then stabbed him with his own knife, which he afterwards threw in the river. No witness speaks of any wound found on the body. It was

not even examined in order to ascertain whether or not it showed any marks of violence. Can we presume, if the body had been examined, it would have shown that the skull was crushed? This would be to indulge a presumption against appellant, and, notwithstanding his alleged confession to this effect, we would not be authorized to indulge such a presumption against him."

To presume that the fire was of incendiary origin would not only be indulging a presumption against accused contrary to the law, but would be a presumption against human experience, because scarcely a day passes without the newspapers carrying press news that some residence has been destroyed by fire resulting sometimes in the death of entire families, and with no suggestion of incendiarism in connection with it.

The substance of appellant's written confession is that on the night of January 4th, 1926 he had started home with one Chaves with whom he intended to spend the night; that they met Ulite who suggested that they go rob Mr. Paddock; that appellant declined but Ulite threatened appellant with a pistol and compelled him to go; that Chaves picked up a big stick before they reached deceased's place; that the latter was called to the door by Chaves who entered the house while appellant and Ulite remained outside; that in a few minutes appellant heard a blow and Mr. Paddock cried out, another blow and Mr. Paddock cried out again but in a weaker voice, then a third blow and heard Mr. Paddock fall but no further cry from him; that before Chaves came out he set fire to the house; that after going some mile and a half from the place he gave appellant $13 of the money which Chaves said he got out of the house. We quote the following from the confession as bearing pointedly on the question under consideration.

"I know Chaves did kill and rob (Paddock) because I heard him strike him and he later told me that he had struck him and burned him by setting the house afire, after having taken $40 in money from him and two pistols; that is he took the money and pistols after he had killed him with a stick above referred to, after which he set fire to the house."

Appellant's confession is that Paddock was killed with a *stick* and the house set on fire evidently for the purpose of hiding the crime. There is nothing in the evidence to corroborate or support the confession that Mr. Paddock came to his death by the criminal agency suggested in the confession. To meet the requirements of the law necessary to supplement the confession resort must here be had to

presumptions, (1) That if the body had not been too completely destroyed wounds would have been discovered on it showing that deceased came to his death by criminal violence. (2) That the house was fired by design and was not the result of accident. Such presumptions can not be indulged against appellant, notwithstanding his confession. (See last sentence in quotation from Follis case, supra.)

We cannot refrain from saying that appellant's confession does not come into this record free from incidents precedent thereto which subject it to the closest scrutiny and justify the strictest application of the rules of law controlling. The written confession was taken by and under the supervision of Mr. Henry Russell. He was an attorney, but not an officer at the time and had never heard of appellant or this case. The district attorney and the county attorney were both absent and Mr. Russell was called by the sheriff to assist in taking the confession which was made in the office of the sheriff who was present. The confession recites that appellant was *warned by the sheriff* and that the confession was made *to him*. We state these facts as bearing upon what had gone before because nothing occurred in Mr. Russell's presence or at the time the confession was actually being taken by him suggesting that the confession was other than voluntary on the part of appellant. The incidents leading up to the confession are here set out. Accused was arrested some thirty days after the body of deceased was found. He was placed in jail in the same cell with another Mexican, named Delgado. A dictaphone had been installed in the cell. After listening to a conversation between the two the officers were of opinion they recognized appellant's voice telling Delgado about how deceased was killed after which the officers took both of them to some point in the country, (the sheriff says to the "rifle range") appellant having a chain around his neck at the time. The purpose of this trip is thus stated by the sheriff.

"As to the purpose of taking him out there, we had overheard a conversation in the jail where he had made a statement to the man he was talking to and we took the two out there to let them talk it over in our presence. They talked it over out there. The man that he was talking to told us about the conversation that we had heard, and of course he stated that he did not do it, and the other man stated that he did. This defendant denied it out there. We did not make any threats out there, not a one. We then brought him back."

Just why it was thought necessary or advisable to take the two men out in the country "to let them talk it over" in the presence of the officers is not apparent when the same thing could have been accomplished in the jail or the district attorney's or sheriff's office. Appellant stoutly maintained that it was Delgado who was telling appellant in the jail about the killing of Paddock. At any rate, appellant on this occasion refused to confess. The sheriff tells about the next trip with appellant as follows:

"We kept the defendant in jail about a week before we took him out again. The second time we took him up to the scene where the house had been burned. On that night we put a handkerchief over his eyes and had him blindfolded and had a chain around his neck. We then had him sit down over the spot where we picked up Mr. Paddock's body, and we had bones there for him to look at; they were human bones and were the bones we had picked up right at the spot where he lay. I don't know of anything else that we showed him. We did not have a fire built up right near. We took the blindfold off of him, and when we took that off he was sitting there viewing those bones, and I asked him if he knew where he was at, and he said 'No;' and the car lights were out on the out buildings and he looked out there and recognized the place. I then told him not to feel uneasy, that he wasn't going to be hurt, that he wasn't in no danger, that we wanted him to locate the lay of the ground. He was not put down on his knees, he sat down, blindfolded. After he had sat down I took the blindfold off and let him look at the bones and let him look at the safe on his right side. He did not acknowledge that he committed that offense there; if I remember right Louis Robison was standing there by him and they were off gathering stuff and picking it up by the light of the car, and pretty soon Louis said 'Come on, he wants to tell us the truth, or tell us about it,' and we come on, all of us. He did not tell it there. It is not a fact that somebody told him that if he didn't talk we would burn him, absolutely no. There were no threats made. I told him all the time not to be scared, not to be uneasy, that I would protect his life with mine, that there isn't nobody going to hurt you. I was going to protect him against mob violence, but I did not tell him 'against mob violence.' * * * After we brought him back to jail we then brought him to my office. We still had the chain around his neck. He made a confession in my office and that confession was along the same line as the other confession. He made the first confession that night in my office somewhere around eleven that night, and if I remember

it was the next day somewhere around noon that he made the second confession, and that was the one when Judge Russell was present."

Upon the trip to the scene of deceased's store there were present with the sheriff Louis Robison, Roy Wilcox, and Frank Joplin and another party whose name the sheriff did not recall. It appears from the sheriff's evidence that Frank Joplin was dressed in "white clothes" upon that occasion. This trip was made on the night of the tenth of March and it is only by inference we might reach a conclusion whether Joplin thought it was the weather or the occasion that made the wearing of "white clothes" appropriate. He was not used as a witness and did not explain this incident; neither did any other witness. Just what the sheriff meant in his testimony by the statement that "They were off gathering stuff and picking it up by the car lights" at the time they had appellant at the scene of the alleged murder is not explained by him or any other witness, unless some light is thrown upon it by the testimony of appellant himself. Appellant testified upon the trial with reference to the confession as follows:

"I heard a statement offered in evidence by the state alleging to have been a confession made by me; I made that confession because they scared me; they were going to kill me. At the time they threatened to kill me I was at that house where they took me, at this ranch. They took me there in the car of Louis Robison. I was chained, with a handkerchief around me, and blindfolded; I was chained on the neck. It was a long chain—a wagon chain. As to what they did to me or did after we got to the place where the house was burned; they told me to tell the truth or they would kill me by a fire they built there, they were going to burn me. They did not do anything else but make the fire and sat me down there on a pile of dirt. They did not say anything about how they were going to burn me. There was a stob driven down in the ground near the fire, Kiser (the sheriff) put it down there with the chain. The end of the chain was about six or seven feet from that stob."

It was not claimed by appellant that any threats were made by the sheriff or anyone else at the time the written confession was actually taken. Mr Branch states the rule under such circumstances to be that:

"Where the confession has been obtained by improper influences, it is not rendered admissible where defendant is then warned, and repeats it while still under such influences. Barnes v. State, 36 Tex. Cr. R. 356; Clayton v. State, 31 Tex. Cr. R. 490, 21 S. W. 255."

See also Searcy v. State, 28 Tex. Cr. App. 513; Williams v. State, 225 S. W. 177. If appellant had been threatened by the officers and put in fear of his life, or if the conduct of the officers in the absence of an open threat had been such as to put appellant in fear of his life, and this was still operating upon his mind at the time he made the written confession the same would not be admissible. This question was not submitted to the jury but doubtless would have been if the court's attention had been directed to the omission. We mention it in order that it may not be overlooked in the event of another trial.

We also find from an examination of the record that in the development of the state's case testimony was received as to the statement made by appellant to his cell mate Delgado, which was heard over a dictaphone. Testimony is also found in the record which, while not stating the details of the confession made by appellant at the sheriff's office the night before the written confession was taken, is in effect equivalent to a detailed statement as it recites that appellant made in the sheriff's office on the night in question a statement substantially the same as the one made the next day in his written confession. None of this testimony was admissible, either to contradict the written confession or to impeach appellant as a witness, the statements having been made while appellant was under arrest and in jail. However, if objection was interposed to this testimony it is not made to so appear in the record in such a way that we can take cognizance of it.

Another matter which could only have served to prejudice appellant's case appears to have gone into the record without objection. On cross examination appellant denied that he had ever been indicted for assault with intent to murder. On rebuttal the sheriff of Mitchell County was called by the state and testified that appellant was arrested on a charge of assault with intent to murder and was bound over to the grand jury but that the complaining witness "backed up and would not testify," and that appellant was indicted for carrying a pistol. A grand jury having intervened without returning an indictment for assault to murder, the fact that appellant was arrested and charged by complaint with such offense was not admissible. Shamblin v. State, 88 Tex. Cr. R. 589, 228 S. W. 241; Newton v. State, 94 Tex. Cr. R. 288, 250 S. W. 1036. We call attention to these matters in order that improper evidence may not be received in the event of another trial.

Upon a more critical examination of the entire record in the light of appellant's motion for rehearing, we are in such grave doubt as

to the propriety of permitting this conviction to stand that the motion for rehearing is granted, the judgment of affirmance set aside, and the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

CONCURRING OPINION.

MORROW, Presiding Judge.—Touching the adequacy of the proof of the corpus delicti, the writer finds himself in doubt. If the facts shown by the officers of the State to have preceded and accompanied the taking of the confession were more convincing concerning the validity of the document signed by the appellant as a confession of guilt, my views relating to the proof of the corpus delicti might be more definite. The conclusion has often been asserted, and is deemed sound, that doubts in the appellate court should be resolved in favor of the accused.

In the present case, a Mexican has been condemned to forfeit his life for a crime which he claims he did not commit. Eliminating the alleged confession of the appellant, my associates entertain an honest difference as to whether the proof shows that the crime was committed. That fact is enough to demonstrate that the question is not without difficulty. The evidence shows without dispute that while the appellant was incarcerated in jail the officers, ignoring the statute which inhibits the use against one accused of crime of declarations made while in custody when not reduced to writing after warning, placed a dictaphone in the jail and thereby claimed to have heard a conversation between the appellant and another person confined in jail. This testimony was received without objection, though if objection had been urged, the statute (Art. 727, C. C. P., 1925) and innumerable announcements of this court would have condemned it as improper. Thereafter, as related in the opinion of Justice Hawkins, and as conceded by the sheriff, the appellant, blindfolded and with a chain around his neck, was taken at night to the spot where the deceased lost his life, and with the bones of the dead man placed before his eyes, was told not to feel uneasy as he was in no danger. According to the officers, he there recognized the place and in effect admitted his guilt. This evidence was introduced without objection and in violation of the statute, Art. 727, supra. With the chain still around his neck and in custody of the same officers, he was led back to jail and there made what is termed and what is used as a voluntary confession of guilt. While at the

place described, where the scene was staged such as above mentioned and more fully set out in the opinion of Judge Hawkins, one of the officers or his companion was dressed in what is termed "white clothes," and according to the appellant, a fire was built and a stake driven into the ground, and he was told in effect to confess or suffer death by fire. The appellant was not represented by counsel of his own choice but by one appointed by the court. If proper objection had been made, or any objection in fact, much of the evidence which must be relied upon to establish the corpus delicti, would, in obedience to the mandatory statutes of the State, have been excluded. The whole record makes it manifest that the appellant has not had a trial such as is contemplated by the law of the land, and the evidence that a crime has been committed at all being such as to impress upon the minds of my associates diverging views, I cannot without violence to my conscience write the words which condemn this man to death, and must therefore concur with my associate, Judge Hawkins, in the reversal of the judgment.

DISSENTING OPINION.

LATTIMORE, Judge.—My Brethren think this case should be reversed. I do not, and will state my reasons. My Brother Hawkins has doubt of the sufficiency of the proof, i. e., to show that deceased came to his death through the criminal agency of some person; Judge Morrow expresses some doubt as to the confession.

The admissibility of the confession was combated and the issue was submitted to the jury. If there was doubt of its competence, this was the course to pursue, and having been followed, it seems to me this court is concluded. In other words, the written confession of appellant fully admitting his guilt was proved up by Mr. Russell, who took same. Both on its face and according to Mr. Russell's testimony the confession was in every way in conformity with our statute, and therefore prima facie admissible, and the trial court properly admitted it when offered. Afterward, in the development of the defense, there was an attack on the voluntary character of the confession, and under all the authorities it then became the duty of the court to submit to the jury the issue of whether the confession was freely and voluntarily made, without compulsion, fear, etc., and to give to the jury appropriate instructions as to what they should do under the circumstances found by them to exist. This was done, and the charge was acceptable to the accused who took no exception to the form in which this issue was submitted. I confess my in-

ability to see what could have been otherwise done, and am forced to believe that nothing different could be done on another trial, and, therefore, am of opinion that in this no error appears.

Under all the authorities, when one makes a confession of his guilt of murder, there remains but the question as to the sufficiency of the other facts in evidence to corroborate such confession. Such other facts may be circumstantial in character and extent. In Kugadt v. State, 38 Texas Crim. Rep. 694, Judge Hurt says:

' "When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. 'Full proof of the body of the crime, the corpus delicti, independently of the confession, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient.' 3 Am. and Eng. Enc. of Law, p. 447. We take it that there can be no question that the prosecution is permitted to prove by circumstantial evidence the corpus delicti, and in aid thereto use the confession of the appellant."

Mr. Branch on page 1049 of his valuable Annotated P. C., cites authorities supporting the rule thus announced by Judge Hurt in the Kugadt case. I most earnestly contend that if effect be given to this rule this case should not be reversed for lack of circumstances supporting and corroborating appellant's confession. These facts I summarize: The indictment charged the killing by burning with fire. Appellant confessed that after deceased was struck, in the darkness of the inside of his house, and fell, the house was set on fire and burned up, which latter fact was established by outside circumstances and is corroborative of the confession. The house was burned about midnight. The remains of the body of deceased were found in the house. He was burned up in said fire, and aside from the facts related in the confession there is nothing in the record to suggest that his death was not caused by the fire. The confession was thus corroborated. Appellant further confessed that he and his confederates approached the house of the deceased in the nighttime to rob him; that one of his confederates picked up what appellant says was a "big stick" as they approached. Said one of appellant's confederates went into the house with deceased when the latter came to the door upon being called. In a few minutes, according to the confession, appellant heard the sound of a blow—a cry from deceased; then another blow, a feebler cry from deceased; then another blow followed by silence, after which the house was set on

fire. Next morning near the charred remains of deceased was found a sledge hammer which had been lying out in the yard some sixty feet from the door. Beyond doubt this was the seeming "big stick" picked up and carried into the house and used by appellant's confederate in striking the blows heard by appellant. Another corroborative circumstance indicating the weapon used in striking the blows which appellant admitted he heard. Appellant confessed that when they reached the store of deceased (over which he slept) they called deceased down, and when he came to the door they said they wanted to pay "some accounts." The safe of the deceased was in the southwest corner of the store building. Ordinarily books of accounts would be kept over night in a safe in such situation. When deceased was told at the door by Chaves, appellant's confederate, that he wished to pay some accounts, he turned and went into the store followed by Chaves. So says the confession. In a few moments the blows were heard. Next morning we learn from other testimony that the burned body of deceased lay near the safe. Another corroborative circumstance. Appellant confessed that Chaves got about $40.00 and brought it back out of the house after he struck deceased. Next morning the safe of deceased was found open. Another corroborative circumstance. True, appellant did not say that Chaves told them he got the money out of the safe, but it stands to reason that a merchant with a safe immediately at hand would not be carrying $40.00 in money in his pocket at night. Appellant also confessed that deceased came to his death by violence, therefore not by reason solely of a fire of unknown origin. Testimony aliunde the confession showed that deceased slept upstairs in a bed by an east window in the back part of the building. The fire was at midnight. Ordinarily deceased would have been in bed either in some kind of night-clothes, or only in under-clothes, and if surprised and caught by a fire his body would have been near where this bed was located, but the facts aliunde the confession show his body to have been found near the safe in the southwest corner of the store, nowhere near the place where the bed was located, and that instead of being in night-clothes or under-garments, the garments had on by deceased *contained his watch,* which was found by the body the next morning, as were his keys, suspender buckles, etc. What is the rule above stated by Judge Hurt in the Kugadt case: "When a confession is made, and the circumstances therein related correspond *in some points* with those proven to have existed, this may be evidence sufficient to satisfy a jury," etc. The jury are men

without interest in the case; they are men of ordinary intelligence, supposed to have fair judgment and responsive conscience. The law does not intend, nor should it be construed in its application to have such effect,—to go beyond what sound reason and judgment would uphold and good conscience approve. The Kugadt case, supra, said the confession could be looked to in arriving at an understanding of the circumstances in evidence, and in aid thereof; also that the circumstances could be looked to as corroborative of the confession, and if both together make out the case so the jury were convinced, it should be upheld. The same is true of all the cases when fairly understood. The Lovelady case, 14 Texas Crim. App. 545, cited by my Brother Hawkins, has in it no confession, and the discussion in the opinion is therefore not in point. The Follis case, 51 Texas Crim. Rep. 186, also cited by my Brother Hawkins, is absolutely devoid of a single circumstance corroborative of the confession, and it is therefore not in point.

But in the case before us, the confession which the jury were told, and for that matter must again upon another trial be told, to consider if freely made, admitted appellant's guilt of a planned cold-blooded assassination of a defenseless man for no other purpose save robbery. The circumstances introduced from other sources beside the confession corroborated it not only in some points, but in many points, and not one single recital of the confession is contradicted by any testimony. So that it seems to me there was nothing for the jury then, nor can there ever be for any jury in the future in this case, anything to do save to find the accused guilty and to fix an adequate punishment.

Not being able to agree with my Brethren that the case should be reversed, I am of opinion the motion for rehearing should be overruled, and because so unable, I most respectfully enter my dissent.