**Robert Allan MAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 66248.

Court of Criminal Appeals of Texas, En Banc.

May 20, 1981.

Rehearing Denied July 15, 1981.

Ken J. McLean, W. B. "Bennie" House, Jr., Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Susan W. Crump, and Ted Poe, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

The appellant asserts twenty-nine grounds of error. Since he complains that the evidence is insufficient to corroborate accomplice witness testimony, a detailed recitation of the facts is necessary.

Appellant was indicted for the murder of his stepfather, Roy Melton Ayotte. It was alleged that the appellant, for remuneration and the promise of remuneration, hired Arthur Smith to kill Ayotte. Ayotte had been shot once; his body was found outside the Acme Refrigeration Company located at 3111 Polk Street in Houston.

Arthur Smith, who admitted he shot the deceased, pled guilty to murder and testified as a State's witness in return for the State's promise not to seek the death penalty against him. The appellant did not testify.

Smith, a part-time employee at a service station owned by Troy Pardue, testified as follows concerning the events preceding the commission of the offense: He became acquainted with appellant in 1976 and in late September or early October, 1977, appellant approached him about killing the deceased and told him that upon the death of the deceased, the Acme Refrigeration Company, a business then owned and operated by the deceased, would pass to appellant's mother who in turn would allow appellant to operate the business. In return for the killing, appellant promised him payments of $1,000 and a 1968 Oldsmobile immediately after the killing and approximately $4,000 and a job within the following three year period. In preparation for the killing, he and appellant discussed various ways to kill the deceased and various alibis he could use. On four different occasions, he and appellant went to the Hot Wells Shooting Range to practice shooting appellant's .30–.30 Winchester rifle; the same rifle he used to shoot the deceased. While at the shooting range on one of these occasions in late October, 1977, he remembered seeing two police officers target practicing and he also remembered that appellant purchased a new box of ammunition for the rifle. In early November, 1977, appellant delivered a .38 caliber pistol to him, assisted him in placing a lawnmower muffler on the barrel, and instructed him to use it to kill the deceased on Saturday, November 12, 1977. He decided, however, to make no attempt to kill the deceased on either that Saturday or the following Saturday, November 19. Then on November 26, he attempted to kill the deceased, but the shot he fired with the pistol missed. The following week appellant delivered his .30–.30 Winchester rifle to

him in exchange for the pistol and instructed him to kill the deceased on December 3, 1977. Appellant told him to park on Polk Street across from the Acme Refrigeration Company and shoot the deceased with the rifle before the deceased entered the building.

Smith further testified as follows concerning the events surrounding the commission of the offense: He left work on the morning of December 3, 1977, armed with appellant's rifle. He drove appellant's blue Dodge automobile and parked on Polk Street across from the Acme Refrigeration Company. While waiting for the deceased, he observed William Miller and a man named Wayne driving around in the area and he then recalled that Miller had been present on a number of occasions when he had discussed killing the deceased with appellant. When the deceased arrived around 9:30 a. m., he shot the deceased one time with the rifle. At approximately this same time, he observed Miller and Wayne drive away from the scene. He then left the murder scene, placed the rifle in the trunk of the blue Dodge and returned to work that afternoon. Subsequently, he hid the rifle in the garage attic of Pardue's home. Appellant came by Pardue's service station later that day as did Miller and Wayne. He did not discuss the payment with appellant at that time. He did, however, discuss the killing with Miller and he told Miller that he was waiting for appellant to pay him for the killing. That evening he and Pardue went to Pardue's home and while he was there appellant called him on the phone and later came by to get him. He, appellant, and a woman named Vera then went to get the 1968 Oldsmobile before going over to appellant's home where he then received from appellant $150 in cash, papers to the car, and a promise that an additional $350 would be left for him in an envelope at Pardue's service station. After arguing with appellant about a change in the payment terms, he left to visit his estranged wife, Rhonda Stovall. He told Stovall about the killing of the deceased and appellant's involvement in the killing. He left her some of the $150 he was paid by appel-

lant and he then drove to his sister's home in Louisiana. The following day, however, he returned to Houston for the purposes of collecting the $350 from the appellant and revisiting Stovall. He was unsuccessful in his attempt to collect the money from appellant, but he did revisit Stovall. He then returned to Louisiana where he was subsequently arrested for this murder. At the time of his arrest, he was driving the 1968 Oldsmobile given to him by appellant on the day of the murder.

■ The trial court properly instructed the jury that Smith was an accomplice witness as a matter of law. A conviction cannot be had upon the testimony of an accomplice witness unless that testimony is corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. Art. 38.14, V.A.C.C.P.

Troy Pardue testified that Smith left work at approximately 9:00 a. m. on December 3, 1977, Smith did not return to work until the afternoon of the same day, and appellant also came by his station the same afternoon. He and Smith left work around 7:00 p. m. and went over to his home. Shortly thereafter, appellant called on the phone and asked to speak with Smith. Approximately thirty minutes after the phone call, he heard a car horn outside and Smith left. He did not, however, observe the occupants of the car.

Rhonda Stovall, Smith's estranged wife, testified that as early as November, 1977, Smith had mentioned killing a man for appellant. She also testified that Smith visited her around 10:00 p. m. on the night of December 3, 1977, and told her about the killing of the deceased and appellant's involvement in the killing. He left her some money which he told her was part of the payment he received from appellant for killing the deceased. The following evening, he again visited her.

Stovall further testified that based on what Smith had told her about the killing, she contacted Houston police officers by

phone on two different occasions. In the first phone call, she told police officers that she thought the rifle Smith used could be found in the trunk of a blue car which was parked at Pardue's service station. In the second phone call, she told police officers that she subsequently learned the rifle Smith used in the killing could be found in Pardue's garage attic.

R. L. Deloney, an officer of the Houston Police Department, testified that he received two phone calls after the killing of the deceased and that the caller identified herself as Rhonda Stovall on the second phone call. Based on Stovall's information, police officers recovered a spent .30 caliber cartridge on a desk at Pardue's service station and a .30–.30 Winchester rifle in Pardue's garage attic. These items were admitted in evidence.

G. E. Thysson and J. E. Wiggens, officers of the Houston Police Department, testified that they observed appellant with Smith at the Hot Wells Shooting Range in late October, 1977, and that he was carrying a .30–.30 Winchester rifle; the same type of rifle as the one admitted in evidence. They also observed appellant coming out of the office of the Hot Wells Shooting Range carrying a new box of ammunition.

Larry Hoffmaster, an officer of the Houston Police Department, testified that he and other officers conducted a search of appellant's home and discovered a box of ammunition containing .30 caliber cartridges. The box was minus six cartridges. Dallas Lamar, the secretary/manager of the Hot Wells Shooting Range, testified that the handwritten price marking on the box of ammunition recovered from appellant's home appeared to be the handwritten price marking that she placed on boxes of ammunition from her shooting range. Officer Hoffmaster further testified that he recovered the fatal bullet at the murder scene. Although the bullet was badly damaged, Robert Warkentin, a chemist, testified that it was a .30 caliber bullet.

William Miller was called by the State as a rebuttal witness. Appellant argues that Miller's testimony may not be considered in

corroboration of Smith because Miller was an accomplice witness as a matter of law. See *Caraway v. State*, 550 S.W.2d 699 (Tex. Cr.App.1977); *Chapman v. State*, 470 S.W.2d 656 (Tex.Cr.App.1971).

Miller testified that appellant told him on at least three occasions prior to December 3, 1977, that he (appellant) wanted a man on Polk Street killed and that he (appellant) had hired Smith to do the killing. He further testified that Smith was present on at least two of these occasions and that Smith had also told him that he (Smith) had been hired by appellant to kill a man on Polk Street. On the evening of December 2, 1977, appellant delivered to him a .38 caliber pistol with a lawnmower muffler attached. The following morning, he and Wayne Spring drove to Polk Street to wait for a man; Miller was carrying the .38 caliber pistol with him at this time. He saw the man he was waiting for shot, but he did not see who fired the shot. He and Spring then drove to Pardue's service station where he told appellant about the killing. Appellant said he knew of the killing but stated that he did not wish to discuss any of the details at that time. Miller subsequently talked with Smith and Smith told him that he had just killed a man and that he was waiting to be paid by appellant for the killing.

Miller was asked if he could identify the rifle offered in evidence by the State. He testified that it was the same rifle appellant had delivered to him about a month prior to the killing and the same rifle appellant had then obtained from him about a week prior to the killing of the deceased.

The record reflects that the appellant withdrew his request for the court to instruct the jury that Miller was an accomplice witness and he objected to the court submitting such an instruction. However, the court submitted the issue of whether Miller was an accomplice witness as a fact question for the jury to decide. Where there is doubt whether a witness is an accomplice, submitting the issue to the jury is sufficient even though the evidence preponderates in favor of the conclusion that the

witness is an accomplice as a matter of law. *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr. App.1979); *Colunga v. State*, 527 S.W.2d 285 (Tex.Cr.App.1975); *Ward v. State*, 520 S.W.2d 395 (Tex.Cr.App.1975). Miller admitted that he knew of the scheme to kill the deceased and that he was present at the scene of the offense carrying a pistol delivered to him by appellant. There is no evidence that Miller was ever charged with this offense or that he was a party to any agreement between appellant and Smith. A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose or even concealed it. *Carrillo v. State*, supra; *Easter v. State*, 536 S.W.2d 223 (Tex.Cr.App.1976); *Gausman v. State*, 478 S.W.2d 458 (Tex.Cr.App.1972). Mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness. *Arney v. State*, 580 S.W.2d 836 (Tex.Cr.App.1979); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr. App.1978). One is not an accomplice witness who cannot be prosecuted for the offense for which the accused is charged. *Carrillo v. State*, supra; *Villarreal v. State*, supra; *Easter v. State*, supra. A witness' complicity with the accused in the commission of another offense does not make his testimony that of an accomplice to the offense for which the accused is on trial. *Carrillo v. State*, supra; *Caraway v. State*, supra; *Easter v. State*, supra. We hold that the trial court did not err in submitting the issue of whether Miller was an accomplice witness as a fact question for the jury. See and compare *Carrillo v. State*, supra; *Ward v. State*, 520 S.W.2d 395 (Tex.Cr.App.1975); *Zitterich v. State*, 502 S.W.2d 144 (Tex.Cr.App.1973).

■ In view of the court's instruction and the jury's verdict, we may consider the testimony of Miller in corroboration of the testimony of the accomplice witness Smith. To test the sufficiency of the corroboration of an accomplice witness, one must eliminate from consideration the evidence of the accomplice witness, and then examine the evidence of the other witnesses to ascertain if it is of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. *Carrillo v. State*, supra; *Brown v. State*, 561 S.W.2d 484 (Tex. Cr.App.1978); *Caraway v. State*, supra; *Etheredge v. State*, 542 S.W.2d 148 (Tex.Cr. App.1976); *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1972). The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Lyman v. State*, 540 S.W.2d 711 (Tex.Cr.App.1976); *Bentley v. State*, 520 S.W.2d 390 (Tex.Cr.App.1975); *Black v. State*, 513 S.W.2d 569 (Tex.Cr.App.1974); *Cherb v. State*, 472 S.W.2d 273 (Tex.Cr.App. 1971). The corroboration need only make the accomplice's testimony more likely than not. *James v. State*, 538 S.W.2d 414 (Tex. Cr.App.1976); *Bentley v. State*, supra; *Warren v. State*, 514 S.W.2d 458 (Tex.Cr. App.1974).

■ There is ample evidence in the record to corroborate Smith's testimony other than the mere commission of the offense. We hold that the testimony of Miller and that of the other State witnesses, is incriminating, tends to connect appellant to the commission of the offense, and makes Smith's testimony more likely than not. Appellant's challenge to the sufficiency of the evidence to corroborate Smith's testimony is overruled.

Appellant next asserts the trial court erred in failing to grant his motion to quash the indictment. In his motion to quash appellant states that the indictment is insufficient in that it alleges "remuneration generally, vaguely, and indefinitely . . . absent specificity, thereby making it impossible for the Defendant to defend himself against such a cryptic and enigmatic accusation."

■ The indictment in pertinent part alleges that the appellant on or about December 3, 1977,

". . . did then and there unlawfully, intentionally and knowingly cause the death of Roy Melton Ayotte by employing another, namely Arthur Smith, to commit the murder for remuneration and

the promise of remuneration and said Arthur Smith did cause the death of Roy Melton Ayotte pursuant to the aforementioned agreement by shooting him with a gun."

An indictment must allege facts sufficient to give a defendant notice of precisely what he is charged with. Art. 21.11, V.A.C.C.P. However, unless a fact is essential for notice to the defendant, the indictment need not plead the evidence relied on by the State, *Phillips v. State*, 597 S.W.2d 929 (Tex.Cr.App.1980), *Cameron v. State*, 401 S.W.2d 809 (Tex.Cr.App.1966), *Bedwell v. State*, 142 Tex.Cr.R. 599, 155 S.W.2d 930 (1941), and it is a rare exception when an indictment drawn in the language of the penal statute is legally insufficient to provide a defendant with notice of the charged offense. *Phillips v. State*, supra; *Parr v. State*, 575 S.W.2d 522 (Tex.Cr.App.1978); *Ames v. State*, 499 S.W.2d 110 (Tex.Cr.App. 1973); *Lopez v. State*, 494 S.W.2d 560 (Tex. Cr.App.1973).

V.T.C.A.Penal Code, Sec. 19.03, in part provides:

> "Sec. 19.03(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
>
> \* \* \* \* \* \*
>
> "(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration."

V.T.C.A.Penal Code, Sec. 19.02, in part provides:

> "Sec. 19.02(a) A person commits an offense if he:
>
> "(1) intentionally or knowingly causes the death of an individual."

██ The indictment in the instant case contains all of the constituent elements of an offense under the provisions of V.T.C.A. Penal Code, Sec. 19.03(a)(3). The additional information requested by appellant in his motion to quash is evidentiary and not required for purposes of notice and plea in bar. We therefore find the indictment sufficiently alleges facts to enable the appel-lant to prepare his defense and is not subject to a motion to quash. See *McManus v. State*, 591 S.W.2d 505 (Tex.Cr.App.1979). See and compare *Haecker v. State*, 571 S.W.2d 920 (Tex.Cr.App.1978); *Moore v. State*, 532 S.W.2d 333 (Tex.Cr.App.1976).

██ Appellant next asserts the trial court erred in overruling his objection to the testimony of a police officer that he observed no remorse on the part of appellant. Officer Deloney testified that he had a conversation with appellant three days after the shooting of the deceased, appellant did not appear to be emotionally upset, appellant was neither crying nor weeping, "there was no remorse that he evidenced," and appellant became nervous when questioned about the rifle. Appellant's objection was made relative to appellant showing "no remorse that he evidenced" for the reason that it called for a conclusion on the part of Officer Deloney.

This Court has consistently held that when a lay opinion as to the mental attitude or emotional state of an accused is the mere shorthand rendering of the facts, the opinion is admissible as indicative of demeanor, subject to cross-examination as to the facts upon which it is based. See *Brown v. State*, 561 S.W.2d 484 (Tex.Cr. App.1978); *Ashley v. State*, 527 S.W.2d 302 (Tex.Cr.App.1975); *Miller v. State*, 145 Tex. Cr.R. 419, 168 S.W.2d 864 (1943); *Hernandez v. State*, 110 Tex.Cr.R. 159, 8 S.W.2d 947 (1927); *Willis v. State*, 91 Tex.Cr.R. 329, 239 S.W. 212 (1922); *Beaupre v. State*, 206 S.W. 517 (Tex.Cr.App.1918); *Crowell v. State*, 56 Tex.Cr.R. 480, 120 S.W. 897 (1909). We find the evidence that, after the shooting of the deceased, Officer Deloney spoke with and observed the appellant's actions and demeanor, is competent and the complained of statement describing appellant's mental attitude is merely a shorthand rendition of the facts occurring on that visit. This ground of error is overruled.

Appellant next asserts in thirteen related grounds of error that the provisions of Art. 38.14, supra, are applicable to the extraneous offenses offered in evidence by the State at the punishment stage of his trial.

We have grouped these grounds of error into three general areas whereby appellant urges that: (1) the testimony of an accomplice witness must be corroborated before it may be used to support the jury's answers to both special issues of Art. 37.071, V.A.C. C.P.; (2) the court erroneously failed to submit, after a timely request, charges on "accomplice witnesses" at the punishment stage of the trial; and (3) the evidence, excluding the testimony of the accomplice witnesses, is insufficient to sustain the jury's findings that his conduct was deliberate and that there was a probability he would commit criminal acts of violence that would constitute a continuing threat to society. Art. 37.071, supra.

Art. 38.14, supra, provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

Art. 38.14, supra, concerns the sufficiency of evidence needed to support a *conviction* and to connect the defendant with the offense charged when the State is relying on accomplice witness testimony. Before the punishment stage of the trial is reached the defendant has been found guilty—he has been convicted—only his punishment remains to be assessed. Nothing in Art. 38.-14, supra, suggests that "yes" answers to the special issues of Art. 37.071, supra, at the punishment stage of the trial cannot be had upon uncorroborated accomplice witness testimony.

Art. 37.071, supra, in pertinent part provides that at the punishment stage of a capital murder trial,

"(a) . . . evidence may be presented as to any matter that the court deems relevant to sentence."

This provision has been interpreted to allow the trial judge wide discretion in the evidence that may be admitted. *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr. App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.d.2d 250 (1977); *Gholson and Ross v. State*, 542 S.W.2d 395 (Tex.Cr. App.1976), *cert. denied*, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977). In *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr. App.1979), it was said:

"In upholding the constitutionality of the Texas death penalty procedures, the United States Supreme Court noted:

" 'Texas law requires that if a defendant has been convicted of a capital offense, the trial court must conduct a separate sentencing proceeding before the same jury that tried the issue of guilt. Any relevant evidence may be introduced at this proceeding . . . . The Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death . . . . *What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.* Texas law clearly assures that all such evidence will be adduced.' [Emphasis added.]

"*Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)."

Relevant information about a defendant includes admitting evidence of his "prior criminal conduct," whether or not such conduct resulted in a final conviction. *Hammet v. State, supra; Jurek v. State, supra.* Uncorroborated accomplice witness testimony falling within the range of "prior criminal conduct" would be relevant information about a defendant and we find nothing in Art. 37.071, supra, to preclude it from supporting an affirmative answer to either special issue. This Court has consistently held that the provisions of Art. 38.14, supra, are not applicable to every facet of a case that is supported by uncorroborated accomplice witness testimony. See *Russell v. State*, 551 S.W.2d 710 (Tex.Cr.App.1977) and *Moreno v. State*, 476 S.W.2d 684 (Tex. Cr.App.1972) (rule inapplicable to revocation of probation hearings); *Komurke v.*

*State*, 562 S.W.2d 230 (Tex.Cr.App.1978) and *Carnathan v. State*, 478 S.W.2d 490 (Tex.Cr.App.1972), V.T.C.A. Penal Code, Sec. 8.07 (rule inapplicable to testimony of a complainant that is too young to be criminally responsible for his conduct); *Cranfil v. State*, 525 S.W.2d 518 (Tex.Cr.App.1975) and *Jenkins v. State*, 484 S.W.2d 900 (Tex. Cr.App.1972) (rule inapplicable to testimony of an accomplice witness called by the accused); *Brown v. State*, 476 S.W.2d 699 (Tex.Cr.App.1972) (rule inapplicable to evidence introduced by the accused); *Saunders v. State*, 572 S.W.2d 944 (Tex.Cr.App.1978) and *Carr v. State*, 495 S.W.2d 936 (Tex.Cr.App.1973) (rule inapplicable to testimony of an accomplice witness when the accused takes the stand and admits all acts constituting the crime charged.) See also *Rice v. State*, 605 S.W.2d 895 (Tex.Cr.App.1980) (on motion for rehearing this Court withheld its ruling on whether an accomplice witness testifying at the guilt stage of a trial about an extraneous offense need be corroborated before the extraneous offense is admissible in evidence.) We hold that evidence offered to prove the special issues of Art. 37.071, supra, is not included within the provisions of Art. 38.14, supra. Therefore, the "yes" answers to the special issues of Art. 37.071, supra, are supportable on the relevant accomplice witnesses' testimony concerning the appellant's prior criminal conduct and the court did not err in failing to submit an "accomplice witness" charge at the punishment stage of the trial.

At the punishment stage of the trial, the State re-offered the evidence adduced at the guilt stage of the trial. In addition, the State introduced the following evidence to show that appellant had been involved in other murder for hire schemes: Miller testified that on the night of December 2, 1977, appellant delivered a pistol to him and asked him to kill a man on Polk Street; appellant offered him $1,000 for the job. Both Miller and Smith testified that appellant had hired them to kill Howard Ross prior to Smith killing the deceased. After one of their unsuccessful attempts to end Ross' life, appellant told them, "[h]e ain't dead. I want him dead." Smith then shot Ross, but Ross did not die from the gunshot wound. When appellant discovered that Ross was still alive, he instructed them to go to the hospital where Ross was recovering and finish him off. This plan was too dangerous and they decided against killing Ross while he was in the hospital. Appellant then instructed them that Ross was going to be transferred to New Orleans and that they should shoot Ross and everyone else in the car en route to New Orleans. They refused, however, to carry out appellant's instructions and Ross was never killed. Miller and Smith also testified that appellant next wanted the deceased's father killed. And Smith further added that appellant discussed with him the killing of a merchant seaman and the killing of an unknown man whose wife wanted him murdered. We find the testimony of Smith and Miller, combined with the evidence adduced at the guilt stage of the trial, sufficiently supports the jury's determination that appellant's conduct was deliberate and appellant would commit criminal acts of violence that would constitute a continuing threat to society. Art. 37.071, supra. These thirteen grounds of error are overruled.

Appellant next asserts that the prosecutor made an improper jury argument. He says the prosecutor attempted to bring to the jury's attention matters not admissible in evidence. During the State's closing argument at the guilt stage of the trial, the following occurred:

"[PROSECUTOR]: You heard Mr. Miller testify up here, and you heard what he had to say, what the law let you hear. He could have told you—

"MR. McLEAN [DEFENSE ATTORNEY]: I object. That's something inadmissible that they couldn't hear, Your Honor.

"MR. POE [PROSECUTOR]: It's what the law lets you hear.

"THE COURT: The jury has heard the evidence.

"MR. McLEAN: May I have a ruling?

"THE COURT: Overruled.

"MR. POE: They could have asked him any question they wanted to on cross examination to impeach him, but they didn't. They wanted to come up with one conflict.

"Remember how Mr. House [Defense Attorney] came up here with that statement and folded it up really little and handed it to Miller so he would read one line? You remember that. You saw that.

"And he told you under oath there is more in that statement than what he testified to. They could ask him anything they wanted to. They say he's a big buddy and all that of Chester's. Why didn't they go into all of that stuff on cross examination? It makes you wonder, doesn't it, about what Miller knew.

"MR. McLEAN: I object to that. That's an inference that there is some inadmissible testimony the jury should have heard. That's inadmissible. I object to that."

Appellant's objection was sustained and an instruction to disregard given. His motion for mistrial was overruled.

 An argument will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused into the trial proceeding. *Todd v. State*, 598 S.W.2d 286 (Tex.Cr.App.1980); *Simpkins v. State*, 590 S.W.2d 129 (Tex.Cr. App.1979); *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977). If a prosecutor's remarks during jury argument may be reasonably construed as referring to the defendant's failure to present evidence through a witness other than himself, reversal is not required. *McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App.1978); *Bolden v. State*, 504 S.W.2d 418 (Tex.Cr.App.1974); *Brown v. State*, 475 S.W.2d 761 (Tex.Cr. App.1971); *Alvear v. State*, 170 Tex.Cr.R. 378, 341 S.W.2d 426 (1960).

 If the prosecutor's argument can be construed to refer to inadmissible testimony, we are unable to conclude that the error is reversible under the circumstances presented in the instant case. Our reading of this record as a whole reveals overwhelmingly the guilt of appellant and we do not perceive the prosecutor's argument to have been extreme or manifestly improper, violative of a mandatory statute, or as having injected new facts *harmful to the accused* into the trial. See *Little v. State*, 567 S.W.2d 502 (Tex.Cr.App.1978); *Taylor v. State*, 550 S.W.2d 695 (Tex.Cr.App.1977). See also *Todd v. State*, supra; *Hardeman v. State*, 552 S.W.2d 433 (Tex.Cr.App.1977); *Mims v. State*, 466 S.W.2d 317 (Tex.Cr.App. 1971); *Hoover v. State*, 449 S.W.2d 60 (Tex. Cr.App.1969). *Cf. Stearn v. State*, 487 S.W.2d 734 (Tex.Cr.App.1972). As a result of the court overruling appellant's first objection, the prosecutor merely commented on appellant's failure to present evidence through the witness Miller. See *McMahon v. State*, supra; *Bolden v. State*, supra; *Brown v. State*, supra. And the sustaining of appellant's second objection followed by an instruction to the jury to disregard the prosecutor's argument sufficiently cured the later error.

 Appellant next asserts the trial court erred in admitting evidence seized during the search of appellant's home. After appellant's arrest and removal from his home, his wife was asked if she would consent to a search of their home. She said that she would consent and she then signed a written consent to search form that was witnessed by three Houston police officers. The search turned up a box of .30 caliber cartridges and various other papers.

In *Nastu v. State*, 589 S.W.2d 434 (Tex. Cr.App.1979), it was said:

"It is the right of every citizen to be secure in his home from warrantless searches in all but a few instances. However, '[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.' *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Cr. App.). But before consent can be effective, the prosecution must prove by clear and convincing evidence that the consent was given freely and voluntarily. *Bump-*

er v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Armstrong v. State, 550 S.W.2d 25 (Tex.Cr. App.); Kolb v. State, supra.

"'Whether a consent to search was voluntary is a question of fact to be determined from the totality of the circumstances.' Brem v. State, 571 S.W.2d 314, 319 (Tex.Cr.App.).

"Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)."

The evidence adduced at the hearing on appellant's motion to suppress reflects that a capias issued for appellant's arrest at approximately 3:00 p. m. and that he was subsequently arrested at his home around 1:00 a. m. the next morning. Officer Hoffmaster, an arresting officer, then talked with appellant's wife to determine whether she would execute a consent to search form. He informed her that she had the right to refuse her consent and that the purpose of the search was to look for evidence implicating appellant in this offense. The consent to search form was signed by her at approximately 1:20 a. m. and it included a statement that she had been informed of her constitutional right not to have a search made. She testified that the police officers had been polite to her; they did not threaten her to obtain her consent for the search. Although appellant introduced evidence to show that his wife is or was an alcoholic, she specifically testified that she was not under the influence of any intoxicants at the time she consented to the search. Given the totality of the circumstances in this case, we find ample evidence to support the trial judge's decision that the appellant's wife voluntarily consented to a search of the premises. See Swinney v. State, 529 S.W.2d 70 (Tex.Cr.App.1975); Jemmerson v. State, 482 S.W.2d 201 (Tex.Cr.App.1972).

■ Appellant also complains that the consent to search form in this case allowed the State to circumvent the warrant requirements because it was used to conduct a general exploratory search. We reiterate that a search conducted pursuant to consent is one of the specific established exceptions to the Fourth Amendment re-

quirements of both a warrant and probable cause. Schneckloth v. Bustamonte, supra; Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); Nastu v. State, supra; Doescher v. State, 578 S.W.2d 385 (Tex.Cr.App.1978). The extent of a consent to search is limited by the consent obtained in a particular instance. May v. State, 582 S.W.2d 848 (Tex.Cr.App.1979). In the instant case, the written consent to search form authorized police officers to conduct a complete search of appellant's home and seized any letters, papers, materials, or other property they desired. This ground of error is overruled.

■ Appellant next asserts in two grounds of error that the trial court committed reversible error in admitting in evidence a written statement of State's witness Arthur Smith. Smith was recalled by the defense and in an attempt to discredit his testimony, defense counsel read portions of a written statement Smith had made to police officers after his arrest. On cross examination, the State requested that the statement in its entirety be introduced. Appellant objected urging that the statement improperly bolstered Smith's testimony and contained references to extraneous offenses. The court overruled appellant's objections.

The record reflects, however, that the statement was later withdrawn by the court on its own motion. Outside the presence of the jury, the following occurred:

"THE COURT: As to Arthur Smith's statement, I'm going to let the record reflect the jury has not seen any of the contents of the statement and the Court is going to sustain the objection you made earlier concerning the extraneous matter and order that it be deleted, that portion of the statement which says, 'He discussed the killing with me and Miller.'

"The portion saying, 'and Miller,' will be deleted from that statement.

"MR. HOUSE: His Honor is going to go ahead and let in the rest of the statement in total? Is that correct?

"THE COURT: Let me look at that statement again.

"We will withhold the ruling at this time. Prior to the statement being given to the jury, we will make that determination. Go ahead."

A careful examination of the remainder of the record reflects that the statement was never readmitted in evidence for the jury's consideration for any purpose whatsoever. Error, if any, is thereby rendered harmless. See *Furtick v. State,* 592 S.W.2d 616 (Tex.Cr.App.1980); *Nelson v. State,* 505 S.W.2d 271 (Tex.Cr.App.1974); *Hopkins v. State,* 480 S.W.2d 212 (Tex.Cr.App.1972).

Appellant next asserts the trial court erred in admitting over objection the testimony of Rhonda Stovall that bolstered the unimpeached testimony of Smith. Stoval was permitted to testify as to statements made to her by Smith on the night of December 3, 1977, that implicated appellant in the murder.

■ Where there is sufficient independent evidence to establish a conspiracy, hearsay acts and statements of a conspirator which are made prior to the time the object of the conspiracy is completed are admissible, *Denney v. State,* 558 S.W.2d 467 (Tex.Cr.App.1977); *Delgado v. State,* 544 S.W.2d 929 (Tex.Cr.App.1977), *Helms v. State,* 493 S.W.2d 227 (Tex.Cr.App.1973), and they are admissible even though occurring out of the presence and hearing of the conspirator on trial. *Lapp v. State,* 519 S.W.2d 443 (Tex.Cr.App.1975); *Saddler v. State,* 320 S.W.2d 146 (Tex.Cr.App.1959).

■ The independent evidence of a conspiracy between appellant and Smith in the instant case is quite sufficient. Appellant argues, however, that "if the statements by Arthur Smith to Rhonda Stoval on the night of December 3, 1977, were after the conspiracy had ended, they were inadmissible and bolstering was the proper objection."

In *Robins v. State,* 117 S.W.2d 82 (Tex.Cr. App.1938), it was said:

"A conspiracy is not finally terminated until everything has been done that was contemplated to be done by the conspirators."

The conspiracy in the instant case did not terminate upon the completion of the murder. It was contemplated by the conspirators that Smith would receive compensation for the job. On the night of December 3, 1977, Smith had not yet received all of the compensation agreed upon; he had only been paid $150 and given the 1968 Oldsmobile. We find that the object of the conspiracy had not been completed. See *Brown v. State,* 576 S.W.2d 36 (Tex.Cr.App. 1978) (rev'd on other grounds on Motion for Rehearing); *Adamson v. State,* 21 S.W.2d 675 (Tex.Cr.App.1929). See also *Bates v. State,* 587 S.W.2d 121 (Tex.Cr.App.1979). This ground of error is overruled.

■ Appellant next asserts he was denied his rights to a fair and impartial trial and due process of law because the State, "intentionally, knowingly, and deliberately presented patently false evidence amounting to a subrogation of perjury on the issue of whether William R. Miller was an accomplice as a matter of law" at the guilt stage of the trial. Appellant argues that because the State presented different versions of Miller's complicity in the murder of the deceased at the two stages of the trial, he was denied due process and a fair and impartial trial.

Miller's testimony at the guilt stage of the trial has already been set out in the recitation of facts. At the punishment stage of the trial, Miller testified that he was present on a number of occasions when appellant and Smith discussed killing the deceased. He was further permitted to testify that on the night of December 2, 1977, when appellant came to his trailer home with the .38 caliber pistol, appellant asked him to use the gun to kill a man on Polk Street. Appellant told him that Smith had (up until that time) failed on two or three occasions to do the job and that he would pay him (Miller) $1,000 for the killing.

Reviewing the evidence at both stages of the trial, we fail to perceive that the State presented false testimony at the guilt stage of the trial on the issue of Miller's complicity. Moreover, appellant does not present us with any specific instances of false testimo-

ny. The State merely presented a more detailed recitation of Miller's complicity at the punishment stage of the trial so that attention could be focused on the alleged extraneous offense involving appellant and Miller. At the guilt stage of the trial, it may have been an improper reference to an extraneous offense if the State had been permitted to prove that appellant had also hired Miller to kill the deceased. This ground of error is without merit.

 Appellant next asserts he was denied his rights to a fair and impartial trial and due process of law because the State, "intentionally, knowingly, and deliberately presented patently false evidence amounting to subornation of perjury on the issue of remuneration" at the guilt stage of the trial. Appellant argues that the State presented false evidence on the issue of remuneration through the testimony of Smith at the guilt stage of the trial.

At the guilt stage of the trial, the following colloquy occurred as Smith was being questioned about the 1968 Oldsmobile:

"Q. [PROSECUTOR]: Mr. Smith, at some time during 1977 did Mr. May approach you about doing some work for him?

"A. Yes, sir, he did.

"Q. And as part of this work that you were to do for him, was there any mention of payment or partial payment for that work being accomplished by transferring an automobile to you?

"A. Yes, sir, it was.

"Q. And was an automobile actually bought by Mr. May for the purpose of paying you for this work that you were to do for him?

"A. Yes, sir.

"Q. What kind of automobile was it?

"A. '68 Oldsmobile"

\* \* \* \* \* \*

"Q. Mr. Smith, did you ever receive possession of that automobile or drive it in any manner, except at the time that it was purchased, until December 3rd, 1977?

"A. No, sir, I did not.

"Q. One other thing, sir. On State's Exhibit No. 1 there is a block that says: 'Date Issued.' What is that date, sir?

"A. 9–14–77.

"Q. September 14th, 1977?

"A. Right.

"Q. Does that sound consistent with the time that you and Mr. May bought that automobile, sir?

"A. Yes, sir, it does.

"Q. Shortly after that time, Mr. Smith, did the defendant begin talking to you about a job, shall we say, in relation to Roy Ayotte, Jr.?

"A. Yes, sir, he did.

"Q. What was the nature of the job that he wanted done, sir?

"A. He wanted him shot.

"Q. Did he want him killed, sir?

"A. Yes, sir, he did."

At the punishment stage of the trial, the following colloquy occurred as Smith was being questioned about the 1968 Oldsmobile:

"Q. And, Mr. Smith, you testified previously in this case that the '68 Oldsmobile that was given to you by Mr. May was actually bought for another job. What was that job, sir?

"A. For Howard C. Ross."

Reviewing Smith's testimony at both stages of the trial, we are unable to say that the State presented false evidence at the guilt stage of the trial on the issue of whether the 1968 Oldsmobile was partial remuneration for the murder of the deceased. The fact that the car was originally purchased as remuneration for another killing does not preclude it from eventually becoming remuneration for this killing. Moreover, at the guilt stage of the trial, it may have been an improper reference to an extraneous offense if the State had been permitted to prove that the car was actually bought by appellant to serve as remuneration for the killing of Ross. Smith's testimony at the guilt stage of the trial merely establishes that the car was purchased in September by appellant for a "job" that he was to do for appellant. Shortly thereafter,

appellant asked him to kill the deceased and the car was then used as partial remuneration for this offense. At the punishment stage of the trial, Smith testified that the car was actually purchased before the attempted killing of Ross; he and appellant discussed killing Ross in September, prior to any discussion concerning the killing of the deceased. He had attempted to kill Ross on three occasions and having failed to kill Ross he was then told by appellant to kill the deceased and the car became partial remuneration for this offense. This ground of error is without merit.

■ Appellant next asserts that the State's failure to disprove the statement of Smith at the punishment stage of the trial that the 1968 Oldsmobile "was remuneration for another offense and not for the instant offense was such exculpatory substantive evidence that a reversal is mandated." We reiterate that at the punishment stage of the trial, Smith testified that the car was originally purchased to serve as partial remuneration for the killing of Ross; he did not testify that the car was in fact the remuneration for that offense rather than the instant offense. The State, therefore, had nothing to disprove other than the fact that the car was not used for the original purpose for which it was bought.

At the guilt stage of the trial, Smith testified that he received the car as partial remuneration for the instant offense. His testimony was corroborated by other circumstances in the case. We find that the testimony of Smith plus the corroborating evidence at the guilt stage of the trial was sufficient to disprove that the car was remuneration for another offense and sufficient to prove that the car was partial remuneration for the instant offense. See *Granger v. State*, 605 S.W.2d 602 (Tex.Cr.App.1980); *McManus v. State*, supra.

Appellant next asserts the trial court erred in admitting over objection the testimony of Mizelle Miller, an inmate at the Harris County Detention Center. Appellant urges that the trial court violated the provisions of Art. 38.22, V.A.C.C.P.; he relies on *Jimmerson v. State*, 561 S.W.2d 5

(Tex.Cr.App.1978), and *Easley v. State*, 493 S.W.2d 199 (Tex.Cr.App.1973).

Prior to Mizelle Miller testifying, appellant called three Harris County inmates to the stand and they all testified that Smith had told them that he killed the deceased in the course of a robbery. The State then called Mizelle Miller as a rebuttal witness and he testified that appellant had told him during their incarceration that he would receive free legal assistance if he would perjure himself at the trial and testify that Smith had told him that he (Smith) killed the deceased in the course of a robbery.

Prior to the 1977 amendment to Art. 38.-22, supra, effective August 29, 1977, there was a long standing rule that an oral statement of an accused, whether made in response to an interrogation or not, while "in jail or other place of confinement or in the custody of an officer," was *ipso facto* inadmissible unless it fell within a statutory exception to Art. 38.22, supra. Oral statements made by an accused to jail inmates concerning a crime for which the accused was in custody did not fall within one of these statutory exceptions and were therefore inadmissible. *Jimmerson v. State*, supra; *Easley v. State*, supra.

■ The 1977 amendment to Art. 38.22, supra, now provides that the limitations of the statute apply only to statements that are the product of custodial interrogations; a voluntary oral statement is admissible if it is not the "result of" or does not "stem from custodial interrogation." The statement from appellant to Mizelle Miller, which was made well after the effective date of the amendment, was not the product of a "custodial interrogation," as that term is defined in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See *Newberry v. State*, 552 S.W.2d 457 (Tex.Cr.App.1977); *Bailey v. State*, 532 S.W.2d 316 (Tex.Cr.App.1975). Moreover, there is no evidence that Mizelle Miller was ever acting as an agent of law enforcement officials in his conversation with the appellant. We therefore find the appellant's statement to Mizelle Miller was properly admitted in evidence over appellant's objec-

tion. See Bubany, The Texas Confession Statute: Some New Wine in the Same Old Bottle, 10 Tex.Tech.L.Rev. 67, 73–6 (1978). *Cf. Jimmerson v. State*, supra at 8, note 1.

■ Appellant next asserts the trial court improperly excused prospective juror Anthony Rein in violation of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). A careful review of the record, however, reflects that no objection was raised to the exclusion of Rein. Failure to object to the improper exclusion of a potential juror waives such error on appeal. *White v. State*, 610 S.W.2d 504 (Tex.Cr.App. 1981). See *Evans v. State*, 614 S.W.2d 414 (1980); *Crawford v. State*, 617 S.W.2d 925 (1980.)

■ Appellant next asserts in three grounds of error the trial court improperly excused prospective jurors R.L. Schlosser, Clarence Ellis, and D.C. Merdian in violation of *Adams v. Texas*, supra. A careful review of the record reflects that no specific objections were made by appellant to the State's challenge for cause that any of the prospective juror's exclusions were inconsistent with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Rather, appellant's objections were directed to the disqualification of the jurors under V.T.C.A. Penal Code, Sec. 12.31(b). We find that the appellant's failure to specify in his objections that the juror's exclusions were inconsistent with *Witherspoon* waived such error on appeal. See and compare *Evans v. State*, supra.

The judgment is affirmed.

ROBERTS, Judge, dissenting.

I agree with Judge Clinton that the objections made during voir dire were sufficient to have preserved the grounds for review. *See generally* my dissenting opinion in *Crawford v. State*, 617 S.W.2d 925, 937 (1980). Venire Member Schlosser was excused on an improper basis. Because of the violation of the Sixth and Fourteenth Amendments, the judgment should be re-

formed to confinement for life. *Evans v. State*, 614 S.W.2d 414, 418 (1980) (Roberts, J., dissenting), reh. denied April 29, 1981.

CLINTON, Judge, dissenting.

In the final grounds of error treated by the majority opinion, the merits of appellant's complaints regarding the State's exclusion of veniremen R. L. Schlosser, D. C. Merdian and Clarence Ellis are avoided by asserting that a careful review of the record reflects that his objections "were directed to the disqualification of the jurors under V.T.C.A. Penal Code, § 12.31(b);" thus, according to the majority, appellant's failure "to specify in his objections that the jurors' exclusions were inconsistent with *Witherspoon* waived such error on appeal."

It seems to me that evasion of meritorious claims on this basis is nothing more than a semantical variation on the late notion that V.T.C.A. Penal Code, § 12.31(b) and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) are "separate and independent bases for excluding jurors in Texas." Whatever inadequacy a majority of the Court might otherwise attribute to the Supreme Court's guidance in the realm of capital jury selection, it cannot be gainsaid that the premise offered by the majority opinion here, in its quietus, has already been constitutionally interred:

"As an initial matter, it is clear beyond preadventure that *Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. *Witherspoon*. . . . While this point may seem too obvious to bear repetition, it is apparent from their frequent references to *Witherspoon* as a ground for 'disqualifying' prospective jurors that the State, and the Texas Court of Criminal Appeals, might have fallen into the *error of as-*

*suming that Witherspoon and § 12.31(b) are both grounds for exclusion. . . ."* [1]
*Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 2527–2528, 65 L.Ed.2d 581 (1980).

The idea that *Witherspoon* and § 12.31(b) may coexist as separate and independent bases for excluding capital veniremen was specifically rejected because § 12–31(b) focuses the inquiry on the prospective jurors' "attitudes," "opinions," "beliefs" *regarding* the *death penalty*; thus § 12.31(b)—like any other criterion which so focuses the inquiry—falls *within* the scope of *Witherspoon.* And the scope of *Witherspoon* constitutes "a limitation on the State's power to exclude" prospective jurors because of their "views about capital punishment." *Adams*, supra, 448 U.S. at 48, 100 S.Ct. at 591.

In view of the fact then that *Witherspoon* identifies not a ground for disqualification, but a constitutional limitation on the *application* of *any* ground of exclusion which focuses on attitudes about capital punishment, it seems that appellant's objection—as described by the majority—was the hypertechnically correct one: that the jurors were being excused under an *impermissible application* of § 12.31(b), and thus were not excludable thereunder at all. As the Supreme Court specifically stated,

"The State could, consistently with *Witherspoon, USE § 12.31(b)* to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the *USE of § 12.31(b)* to exclude jurors on broader grounds based on their opinions concerning the death penalty *is impermissible.*" *Adams*, 448 U.S. at 48, 100 S.Ct. at 2528.

In sum then, I have no disagreement with the majority opinion's characterization of appellant's objections, for it is clear to me that his complaints were indeed being directed to juror exclusions under impermissible, incorrect and unconstitutional applications of § 12.31(b). [2] But the majority opinion's conclusion—having no more substance than its apparitional premise—entirely dissipates on closer inspection.

Indeed, the very inspection suggested, though not undertaken, by the majority opinion itself is the most appropriate: "a careful review" of the voir dire testimony supplies the context and, thus, the meaning of the objections voiced and the understanding of all parties concerned. The voir dire examination of venireman Schlosser is illustrative of the point. It is treated fully in Appendix "A," to which the reader is now referred.

Easily discerned from the examination of Schlosser is the focus of interest on the part of the questioners. The trial judge, as he stated and his questions clearly indicated, felt that what was really in issue was whether the juror could say that his deliberations on fact issues would not be "affected" by the possibility of the death penalty. V.T.C.A. Penal Code, § 12.31(b). Ultimately sensing this, the prosecutor abandoned his leading attempt to exclude Schlosser on the ground that he had "a bias . . . against [a] phase of the law upon which the State is entitled to rely," Article 35.16(b)(3), V.A.C.C.P., and citing *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978), challenged for cause upon Schlosser's unwitting incantation that his "deliberations would be affected."

Clearly, the majority correctly analyzes the record by referencing the disqualification of Schlosser as being "under 12.31(b)." But just as the record discloses the basis for the prosecutor's challenge for cause, so too does it reveal defense counsel's ground of objection thereto.

Indeed, there is nothing oblique about the preceptive orientation of defense counsel's

1. All emphasis is mine unless otherwise indicated.

2. The only other possible meaning of an objection "directed to the disqualification . . . under . . . § 12.31(b)" would be that the defense believed the jurors had stated their deliberations would *not* be affected and were therefore *not* excludable under § 12.31(b) *as that provision was being interpreted* at the time. This, however, cannot be seriously advanced simply because the voir dire testimony reflects otherwise. See Appendix "A" *post.*

concern; the genesis of *every* question he put to Schlosser was the Supreme Court of the United States' decision in *Witherspoon v. Illinois,* supra: would the juror *consider* the death penalty in a proper case; would he *automatically* vote against imposition of capital punishment regardless of the evidence; could he *follow the law* as given and instructed by the court? And indeed whatever "equivocation" this record reflects on the part of Schlosser, it was never in his responses to defense counsel's questions.

In *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Cr.App.1977), it was stated:

"The generally acknowledged policies of requiring specific objections are twofold. First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it.[1] Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony. * * Thus, *where the correct ground of [objection] was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection.*

---

[1] A collateral but important ramification of this function is to provide the trial court with an opportunity to attempt to cure any harm resulting from the action giving rise to the objection. [Citations omitted]."

Does the majority seriously contend that it was not obvious both to the trial court, and the prosecutor that defense counsel believed the venireman was being excused in violation of *Witherspoon?* Clearly, neither the prosecutor nor the trial judge felt that the limitations on exclusion established by *Witherspoon* constituted "the test" in Texas, in view of the approved application of § 12.31(b), supra, by this Court.[3] But that does not mean they failed fully to appreciate *appellant's* position on the matter.

**3.** As of the date of the voir dire here, this Court had held, then reaffirmed, that when a venireperson was excludable under the "State statutory" ground for disqualification, § 12.31(b), it was "unnecessary to consider" the prospective juror's "qualification" under *Witherspoon.* E. g., *Hovila,* supra; *Shippy v. State,* 556 S.W.2d

Indeed, the prosecutor, having been "afforded an opportunity to remove the objection or supply other testimony" took a different tack, easily maneuvering Schlosser's "bias" (as the prosecutor characterized it first) against death as a punishment for a non-trigger capital defendant, into the "magic words" he knew the trial court would act on and this Court would approve. In short, it is clear that nothing done here would have differed had defense counsel uttered the word *"Witherspoon."*

Schlosser was—in the classic sense—an *"Adams* juror." Not once did he depart from his initial statements that he believed in capital punishment in appropriate cases, would follow the law, would consider imposition of the death penalty, and would never automatically vote against its imposition. Yet, with ease he was excluded because he could not swear that his scruples, his hesitancy to be involved in the process, would not "affect" him. It was this recurrent anomaly in Texas cases which finally forced the hand of the United States Supreme Court.

According to *Adams,* the State has no "legitimate interest" in excluding jurors who would follow the law and abide by their oaths *notwithstanding* their opinions or beliefs about capital punishment; further, the implementation *by the State* of any "practice" which exceeds that "legitimate interest," "seriously prejudice[s]" the accused. *Adams,* supra, 448 U.S. at 43, 100 S.Ct. at 2525, 65 L.Ed.2d at 588. In the instant case, the defendant's objection was more than adequate to convey his belief that the State had failed to show itself entitled to the exclusion of venireman Schlosser.

Furthermore, defense counsel was correct: The State did not show its entitlement to the exclusion and the trial court erred by excusing Schlosser on the State's

246 (Tex.Cr.App.1977); *Burns v. State,* 556 S.W.2d 270 (Tex.Cr.App.1977), *relief granted sub nom. Burns v. Estelle,* 592 F.2d 1297 (5 CA 1979), *rehearing en banc granted,* 598 F.2d 1016 (5 CA 1979), *order granting relief aff'd,* 626 F.2d 396 (5 CA 1980) and *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976).

challenge for cause.[4] *Adams*, supra. I would hold that the disqualification of Schlosser alone requires vacation of the death sentence. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).[5]

As in the case of venireman Schlosser, the record discloses that Merdian was fully qualified to sit on the jury which tried appellant for capital murder; conversely, the record does not indicate that the State met its burden of establishing its entitlement to his exclusion. *Witherspoon*, supra. The State's practice, as revealed by this record, seriously prejudiced appellant by depriving him of his constitutional right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 10 of the Constitution of this State. *Adams*, supra.

At a time when the Court should lead the effort to repair the damage this State has sustained through the unchecked use—recently condemned—of § 12.31(b), an attempt to continue its sanction by the majority opinion seems uncommonly inappropriate. I am therefore constrained to dissent to the invitation extended by the majority opinion for the spectre to haunt us for many years to come.

TEAGUE, J., joins.

### APPENDIX "A"

After introducing himself and the attorneys, and advising Schlosser of the charge against appellant, as well as the mandatory penalties, the trial judge continued,

"Now, would the fact that the ... two possible punishments of death or life ... would that affect your deliberations on any fact issue in the case? * * *

I'm really trying find out *how you feel about* the imposition of *the death penalty.* Now *you would be disqualified unless the penalties* of death or imprisonment for life *will not affect your deliberation on any issue of fact.*

*Would the mandatory penalty* of death or life imprisonment *affect your deliberations* on any issue of fact?

A: *No sir.*"

The court informed Schlosser that the attorneys would "go into the principles of law involved" in the case and cautioned that the jury is required to take an oath to follow those principles and base its decision "solely upon the evidence." At this point the prosecutor took over, and during his preliminary comments told Schlosser that appellant was indicated for hiring another to kill the alleged victim; he explained that such conduct constituted a capital offense in Texas. He then asked Schlosser whether he "agreed or disagreed" with that law. Schlosser replied that "it may be more the responsibility of the man that actually pulled the trigger." The prosecutor replied:

"Now, the law provides that the person who does the hiring is subject to the maximum penalty of life or death also. * * * This Defendant is charged with that. He is not charged with doing the murder itself.

---

4. Apropos of the exclusion of Schlosser is the following passage from *Witherspoon*, 391 U.S. at 522, n. 21, 88 S.Ct. at 1777 n. 21:

"Just as veniremen cannot be excluded from cause on the ground that they [voice general objections to the death penalty or express conscientious or religious scruples against its infliction], so too *they cannot be excluded* for cause simply because they *indicate* that *there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him.* The most that can be demanded of a venireman is that he be willing

to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings."

5. As further illustrative of the abuse of § 12.-31(b), supra, that the decision of the Supreme Court in *Adams*, supra, is patently designed to check, I will address the voir dire examination of venireman Merdian in Appendix "B," but suggest to the Court that it not be published in the interest of space considerations. For simple brevity, I pretermit completely discussion of venireman Ellis.

A: *I would have to follow the law* as a Juror.

Q: * * * *Could you follow the law* if the Court tells you that the Defendant or the person that does the hiring is subject to the . . . penalties of death or life imprisonment?

A: *Yes sir.*

Q: * * * I'm not going to try to talk you into a position one way or the other. * * * If you disagree with the law or if you think in your own mind you couldn't put out of your mind the way you feel, that's fine. * * * Now if you disagree with [the law] or if you don't think that that ought to be the law or you don't think looking in your own mind, as only you can, that you could be fair to the State, we would just like to know about it now.

A: *Well, I believe in capital punishment.* If a man sheds another man's blood, then by that man that blood should be required. It seems to me that the man that actually did the murder would be the one . . . subject to capital punishment.

Q: Under our law he is [too]. * * What are your feelings about the person who actually does the hiring?

A: *I would have to go by the law. I'm here to abide by the law.*

Q: *But how are your feelings?*

A: I couldn't . . . give you a yes or no answer on that . . . without studying it and thinking about it.

Q: Well . . . after you are on the jury that's too late to give us an answer. That's what this is all about . . . is to see *how you feel.* * * * We will take as long as you want. * * * If you don't think, sir, that you could sit fairly on that type of jury, just let us know. *I know you will obey the law as best you could,* but sometimes our personal feelings, you know, are important to us. However you feel makes no difference to me. if you can, fine. If you cannot, just let us know.

A: *I really couldn't decide . . .* right now . . . on whether I could sit, you know, with an open mind on his situation.

THE COURT: He's not asking you what you are going to do in this case. He is asking you about your *attitude toward capital punishment* * * *. The question is: Do you believe in capital punishment as applied to a person who hires . . . someone to do the killing?

MR. SCHLOSSER: That's where my problem is.

THE COURT: *You have to answer—*

MR. SCHLOSSER: *I don't think I could.*

MR. POE [Prosecutor]: Excuse me. Are you through, Your Honor?

THE COURT: Yes.

BY MR. POE:

Q: * * * *The answers that we need from you are yes or no.* I know it's human nature—and I say it all the time—I believe I could, I think I could, and that type of thing, or I don't think I could.

*But the judge, in order to make a ruling [of] law, requires you to answer yes or no to the questions.*

 \* \* \* \* \* \*

So I will just ask you again. Knowing what you know, that *the Defendant is not the trigger man in this case, I will tell you he's not,* but he is charged with capital murder—

MR. HOUSE [Defense Counsel]: I object to this type of questioning. The problem is he's getting into the facts of the case. . . . If he wants to present it in a hypothetical type question, that's fine.

MR. POE: I have a right to tell him what he is charged with.

THE COURT: Overruled.

MR. SCHLOSSER: *I would have to say no.*

Q: *You could not sit fairly to the State* knowing that the Defendant is charged with doing the hiring as opposed to actually pulling the trigger; is that right?

A: *Right.*

Q: *I think that was a yes answer?*

A: *Yes.*

Q: And you have thought about this and you have come to the conclusion in your own mind, that *you really couldn't be totally fair to the State because of the nature of the offense he is charged with* ; is that correct?

A: *That's correct.*

Q: And *although you could be totally fair in another type of capital murder case,* you could not be fair in this case because he is not the trigger man?

A: That's correct.

Q: *Is that your answer for the Record and for the Court?*

A: Yes.

Q: I take it I could spend the rest of the day talking to you about that and that would still be your answer, *would it not?*

A: Yes.

MR. POE: *We will challenge him, Your Honor.*

BY MR. HOUSE:

Q: Mr. Schlosser, the question really boils down to the fact that in a proper case, regardless of what the circumstances may be—because you don't know the circumstances and you don't know the facts and you won't know until you hear it coming from the witness stand—you understand that—but the question is: *In a proper case—can you think of any case that would be proper in which you could consider the death penalty for a person who allegedly hired someone to kill someone else?* In other words, *you are not just saying that automatically you wouldn't vote for the death penalty; you could consider it?* That's what I'm trying to find out.

A: You ask some hard questions. Would you repeat that?

Q: Sure. *The key question* here as I see it *is whether or not in a proper case* —and we don't know what it could be—you could conjure up all kinds of horrendous things in your mind—you need to do that while I'm asking you this question—but in a proper case *could you consider assessing the death penalty as a proper punishment if that was in fact an element of the punishment for a person who allegedly hired someone to kill someone else?* In other words, *you wouldn't just automatically vote no to the death penalty; you could in fact consider it in a proper case?* Is *that true?*

A: *Yes.*

MR. HOUSE: I will object to the challenge.

MR. POE: May I have a moment?

THE COURT: Yes.

BY MR. POE:

Q: My question was: ˙Could you be fair and you told me you couldn't really be fair to the State because of the way you feel. *And apparently Mr. House talked to you a little different and a different aspect comes in.* I'm just trying to ask you: Can you be totally fair to the State knowing that the Defendant didn't do the shooting? * * * And I believe you told me that you couldn't really be fair starting out to the State; *you have some type of bias,* maybe, against that type of offense being capital murder; *is that right? Is that right?*

*Is that what you told me?*

MR. HOUSE: I object to the form. The question has to be captioned in terms of ˙*whether or not you could consider the death penalty.* * * * I don't agree with that statement. I think it's *whether or not he could consider it in a proper case.*

THE COURT: *I'm inclined to agree with you, Counsel. I think the issue here is whether you comply with the 12.31.*

MR. POE: The State has the right, as well as the Defense, to have 12 unbiased Jurors in any criminal case, whether it's a capital offense or misdemeanor.

THE COURT: Let me ask you one more questions. [sic]

Mr. Schlosser, in a murder for hire case if you were selected as a Juror, *you could not under any circumstances,* as I understand it, *vote and inflict the death penalty for a person who hired someone else to commit murder regardless of what the facts are?* You could not do it; is that what you are saying?

MR. SCHLOSSER: Well, he mentioned—

THE COURT: You answer my question.

MR. SCHLOSSER: *I want to explain my answer.*

THE COURT: *We don't care—it really doesn't matter why you feel.* We want to know how you feel. Everybody is entitled to his own opinion. You don't have to justify it. * * * *Can you,* if you were selected as a Juror, *under any imaginable set of facts vote to inflict the death penalty on a person convicted of hiring someone else to commit murder?* That's the question.

MR. SCHLOSSER: *Not under any circumstances,* no.

MR. POE: I renew my *challenge.*

THE COURT: I *sustain* the challenge.

MR. HOUSE: I *object* to the sustaining of the challenge.

Defense counsel, obviously skeptical that communication was occurring, continued, asking Schlosser whether he had understood the Judge's question. He explained that what is crucial is that *"you wouldn't just automatically vote* [against the death penalty]; could you in fact *consider* . . . assessing the death penalty if it was a proper case under the proper circumstances?" Schlosser replied, "Certain conditions I could think of where I could and certain where I couldn't." Defense counsel at this point stressed to Schlosser the fact that,

"You don't know the facts of this case or any other case. But there are cases that you can imagine that *you would* definitely *consider,* as I understand it, *assessing the death penalty to a person who allegedly hired someone to kill someone else?* You would as to the person who allegedly hired him, *consider the death penalty;* is that right?

A: *Yes.*

Q: *There are certain cases where that's true?*

A: *Yes.*

MR. HOUSE: I think he qualifies.

MR. POE: Let me ask some questions. * * * *It seems like each one of us get a different answer.* * * * Do you have some difficulty or problem with [the law that the person who does the hiring is subject to the death penalty]?

A: *Yes. Like I told you at the start, I disagree with that.*

 * * * * * *

Q: The fact that you feel that way means that *you would carry that feeling throughout the trial,* wouldn't you?

A: Yes, sir.

Q: *I hate to use the word bias.* * * * But you feel in your own mind that you wouldn't really put that feeling aside because *we can't really put our feelings aside; that's impossible;* is that right?

A: *That's right.*

Q: * * * And if you are a Juror in this case *would you be able to put that aside* or not? If you can't, *just tell the Court.*

A: *No,* sir.

MR. POE: It will be a *challenge for bias.*

MR. HOUSE: I need to ask a couple more questions. * * * Mr. Schlosser, you have already indicated that there are certain cases in which *you could consider the death penalty* [as a proper punishment] for the person who allegedly hired . . . another person to kill a third party—as a proper punishment?

A: *Yes.*

Q: Now, the question here is: Even though you have a bias, the question is: *Can you follow the law?* The Judge is going to give you the law and if that law is that . . . the State is seeking the death penalty on a particular individu-

al, the question is: *Can you follow the law and consider the death penalty despite your bias?* Because we all got biases.

A: A bias—*I have been influenced by biases. The law is not always perfect.*

\* \* \* \* \* \*

Q: The question is whether or not, because of your bias, you would *automatically veto a consideration of the death penalty* in this type of case, ... [murder for hire] as to the person who hired him *if in fact it were a proper case* and *whether* or not *you could follow the law* ...?

A: Well, *I think I would still be influenced by bias.*

Q: Could you set aside your bias and *follow the law* and at least *consider the death penalty* ...? In other words, would you *automatically veto the death penalty* or the consideration of [it] because of your bias?

\* \* \* \* \* \*

A: *I couldn't automatically veto.*

Q: *So you would consider it?*

A: *Yes.*

Q: So your bias itself could be overcome in a proper case; is that what you're saying?

\* \* \* \* \* \*

A: *I couldn't answer yes or no on that because you are always influenced one way or another.*

Q: But the question is, Mr. Schlosser, *could you follow the law and* in a proper case *consider the death penalty* despite your bias? *That's the real question.*

A: *Yes, I could.*

　　MR. HOUSE: *I object to the challenge.*

MR. POE: One more question.

\* \* \* \* \* \*

Q: You disagree with the law, is that correct?

A: Yes.

Q: Can you answer out?

A: Yes.

Q: And you have a strong feeling that *it would affect your deliberations in the case;* is. that right?

A: *Right.* My bias.

Q: We call it bias. I hate to use that term. But let's call it that because we know what we're talking about. \* \* \* [If you] had to make the decision whether it was a death penalty or life imprisonment, *the way you feel would really affect your deliberations, wouldn't it*?

A: *Yes, sir.*

Q: *We are not talking about ... whether or not you could follow the law* because you would be a Juror and you would be sworn to follow the law. *I'm talking about your bias affecting your deliberations.* It would affect you, wouldn't it?

A: Right. *Yes.*

　　MR. POE: Thank you. It will be a challenge.

　　MR. SHAVER [Prosecutor]: In support of that, Your Honor, we would like to show Avila vs. State, which was returned by Criminal Court of Appeals on February 8th of this year.[1] *The very question was answered that way.*[2]

At this juncture, the trial judge was shown the opinion in question; thereafter, he stated, "All right. The Court will sustain the challenge. You will be excused, Mr. Schlosser."

Venirewoman Boyd was upheld because her voir dire examination disclosed that she would be "unconsciously deceptive."

　Both Glass and Boyd—like Schlosser in the instant case—readily admitted that the possibility of the death penalty would "affect" their deliberations.

1. This reference is apparently to *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978).

2. In *Hovila*, supra, Venireman Glass was held to have been appropriately excluded on the State's challenge for cause under § 12.31(b), supra, because it was clear that his "perception of the facts" would be "affected" by the mandatory penalties. Similarly, the exclusion of

But defense counsel objected to the court's ruling before he could question the venireman further. The trial court told him to go ahead. Counsel elicited reaffirmations from Schlosser that he did believe in the law of capital punishment, that he personally disagreed with the law in the respect previously discussed, and then asked,

"Q: But the question is: Despite your bias or your disagreement with that law, *could you follow the law?*

MR. POE: I object to that. *That is not in issue.*

THE COURT: *Sustained.*

Defense counsel then requested an opportunity to make a bill of exceptions.